State *v.* Rhodes

STATE OF CONNECTICUT *v.* AMELIA RHODES
(SC 20070)

Palmer, McDonald, D'Auria, Mullins, Ecker,
Vertefeuille and Prescott, Js.*

*Syllabus*

Convicted of, among other crimes, criminal possession of a firearm and
having a weapon in a motor vehicle, the defendant appealed. The defen-
dant had been driving a car with a passenger, S, a drug dealer with
whom the defendant had a long-standing relationship. They drove around
for approximately forty-five minutes, stopped at a gas station-conve-
nience store, and then drove for another forty-five minutes. The defen-
dant then stopped the car in the lane of travel as they approached a
large, outdoor social gathering, and S exited the car and fired multiple
gunshots from a gun he had been carrying. S then reentered the car
and instructed the defendant to drive. Police officers witnessed the
shooting, and a high-speed police chase ensued, after which the defen-
dant and S were ultimately apprehended. On appeal, the defendant
claimed that the state failed to prove beyond a reasonable doubt that
she possessed a firearm and, therefore, that there was insufficient evi-
dence to sustain her conviction of criminal possession of a firearm. The
defendant also contended that there was insufficient evidence to support
her conviction of having a weapon in a motor vehicle. *Held*:

1. There was sufficient evidence from which the jury reasonably could have
found that the defendant constructively possessed the firearm that S
used in the shooting, as the record contained sufficient circumstantial
evidence that the defendant knew that the firearm was in the car and
that she was in a position to and intended to control the firearm, and,
accordingly, this court upheld the defendant's conviction of criminal
possession of a firearm: the jury reasonably could have inferred that,
by the time of the police chase, the defendant knew that the firearm
was in the vehicle, the defendant likely knew that S was a drug dealer
and that he, therefore, often carried a gun, the fact that the defendant
was driving and thereby controlling the car suggested that she was able
to and intended to control the firearm, the defendant's attempt to flee
from the police after the shooting indicated a consciousness of guilt
stemming from her knowledge of and intent to exercise control over
the gun, the jury reasonably could have inferred that the defendant and
S were not just close friends but willing partners in a joint criminal

* This case was originally argued before a panel of this court consisting
of Justices Palmer, McDonald, D'Auria, Mullins, Ecker and Vertefeuille.
Thereafter, Judge Prescott was added to the panel and has read the briefs
and appendices, and listened to a recording of the oral argument prior to
participating in this decision.

State *v.* Rhodes

venture, and, in view of the fact that there was no evidence indicating that the firearm was anywhere other than in the area of the front seat, the jury reasonably could have inferred that she was physically in a position to exercise control over it; moreover, there was no merit to the defendant's contention that, because S testified that he had actively sought to conceal the firearm on his side of the car by sitting on it or by keeping it between his seat and the passenger's side door, her conviction of criminal possession of a firearm could not stand, as the jury was not required to credit the testimony of S, who lacked credibility and whose testimony was at odds with other evidence presented and the relationship between S and the defendant, whose interests were aligned; furthermore, this court declined to adopt the defendant's position that, because S allegedly had actual possession of the firearm, she could not have constructively possessed that firearm.

2. The defendant could not prevail on her claim that there was insufficient evidence to support her conviction of having a weapon in a motor vehicle on the ground that the "knowingly has" element of the statute ((Rev. to 2013) § 29-38 (a)) under which she was convicted should be construed to mean "knowingly possesses": constructive possession of a firearm would support a conviction even under the defendant's proposed reading of § 29-38 (a), as constructive possession requires knowledge and control of the object, and, in light of this court's conclusion that there was sufficient evidence that the defendant constructively possessed a firearm in connection with her conviction of criminal possession of a firearm, the defendant also must have knowingly possessed that firearm for purposes of her conviction under § 29-38 (a); moreover, the jury's finding that the defendant constructively possessed a firearm for purposes of her conviction of criminal possession of a firearm rendered any potential instructional error harmless, the trial court did not commit plain error in applying the law concerning the construction of the term "knowingly has" in § 29-38 (a) that existed at the time of the defendant's trial, and this court declined the defendant's request to exercise its supervisory authority over the administration of justice to resolve an issue of statutory construction and evidentiary sufficiency, as that authority is generally reserved for the adoption of procedural rules.

(*One justice concurring separately*; *three justices
concurring and dissenting in one opinion*)

Argued September 12, 2018—officially released March 27, 2020**

*Procedural History*

Two part substitute information charging the defendant, in the first part, with the crimes of attempt to commit assault in the first degree, carrying a pistol without

** March 27, 2020, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

State *v.* Rhodes

a permit, having a weapon in a motor vehicle, interfering with an officer, using a motor vehicle without the owner's permission and reckless driving, and, in the second part, with criminal possession of a firearm, brought to the Superior Court in the judicial district of Fairfield, where the first part of the information was tried to the jury before *Kahn, J.*; thereafter, the court, *Kahn, J.*, granted the defendant's motion for a judgment of acquittal as to the charge of carrying a pistol without a permit; subsequently, verdict of guilty of having a weapon in a motor vehicle, using a motor vehicle without the owner's permission and reckless driving; thereafter, the second part of the information was tried to the jury before *Kahn, J.*; verdict of criminal possession of a firearm; subsequently, the court, *Kahn, J.*, rendered judgment in accordance with the verdicts, from which the defendant appealed. *Affirmed.*

*Lisa J. Steele*, assigned counsel, for the appellant (defendant).

*Matthew A. Weiner*, assistant state's attorney, with whom, on the brief, were *John C. Smriga*, state's attorney, and *Michael A. DeJoseph*, senior assistant state's attorney, for the appellee (state).

*Opinion*

D'AURIA, J. The defendant, Amelia Rhodes, challenges her conviction of criminal possession of a firearm in violation of General Statutes (Rev. to 2013) § 53a-217 (a)[1] and having a weapon in a motor vehicle in violation of General Statutes (Rev. to 2013) § 29-38 (a).[2] The evidence presented to the jury at her trial showed that she drove an armed passenger, Lamar Spann, around Bridgeport for ninety minutes, including to and from the place where Spann discharged a weapon. The defendant

---

[1] Hereinafter, all references to § 53a-217 are to the 2013 revision.

[2] Hereinafter, all references to § 29-38 are to the 2013 revision.

State *v.* Rhodes

appeals, arguing that there was insufficient evidence to establish that she constructively possessed a firearm under § 53a-217 (a) or that she knowingly had a firearm under § 29-38 (a). We disagree with the defendant and affirm the judgment of the trial court.

As both of the defendant's claims on appeal challenge the sufficiency of the evidence, we first must construe the evidence in the light most favorable to sustaining the verdict and then determine whether, on the basis of those facts and the inferences reasonably drawn from them, the jury reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. See, e.g., *State* v. *James E.*, 327 Conn. 212, 218, 173 A.3d 380 (2017). "On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a rea-sonable view of the evidence that supports the [jury's] verdict of guilty." (Internal quotation marks omitted.) *State* v. *Taupier*, 330 Conn. 149, 187, 193 A.3d 1 (2018), cert. denied, U.S. , 139 S. Ct. 1188, 203 L. Ed. 2d 202 (2019).

With these principles in mind, our review of the rec-ord discloses the following relevant facts that the jury could have reasonably found. At the time of the shooting at issue, the defendant and Spann had a relationship going back as many as seven years. Spann had been a drug dealer for much of this time, and, because of the risks involved in that enterprise and the need to coerce payments from customers, he commonly carried a fire-arm. According to Spann's testimony, the defendant "[m]aybe" knew he was a drug dealer. Between July 29 and August 17, 2013, the two had once or twice gone together to a rental car agency where Spann had rented a black Chevrolet Impala.

On the afternoon of August 17, 2013, Spann left his home, driving the Impala and carrying a nine millimeter semiautomatic handgun that was not equipped with a

State *v.* Rhodes

silencer. At about 4 p.m., he picked up the defendant at her home. At the defendant's request, she drove the Impala while Spann sat in the front passenger seat.

The defendant and Spann were together in the car for nearly all of the next ninety minutes. For the first forty-five minutes, the defendant drove "around" with no apparent destination. At about 4:45 p.m., they stopped at a gas station-convenience store, and Spann went inside. Surveillance images of him in the store are inconclusive as to whether the gun was on his person or whether it remained with the defendant in the Impala. After Spann reentered the car, the defendant drove for another forty-five minutes. Spann testified that he kept the gun "under [his] lap" or sat on it during this portion of their drive.

At about 5:30 p.m., they approached a large outdoor social gathering near a housing complex on Trumbull Avenue in Bridgeport. The defendant stopped the car in the lane of travel rather than driving toward the sidewalk and stopping there. Spann then exited the car, fired multiple gunshots from the weapon, and reentered the car.

After reentering the car, Spann told the defendant to drive. Unbeknownst to them, however, police officers had been stationed nearby and witnessed the shooting. When the officers attempted to block the Impala with their patrol car, the defendant maneuvered around them and continued along Trumbull Avenue with the officers in pursuit. She proceeded to weave between pedestrians, drive past multiple stop signs without stopping and drive at high rates of speed. After a 1.2 mile car chase, the defendant crashed the car as she approached a highway entrance ramp. Spann testified that, during the car chase, the gun was "on the side of [him] . . . in between the seat and the door."

After the crash, the defendant and Spann fled on foot. The police found the defendant hiding in an unlit sewer

State *v.* Rhodes

in waist-deep water and arrested her. Spann, who initially evaded the police, testified that he disposed of the gun while the police chased him but was arrested after appearing at the Bridgeport police station and falsely reporting that the Impala had been stolen. The police never recovered the gun. Spann pleaded guilty under the *Alford* doctrine[3] to various charges related to this incident and was sentenced. He did not face additional criminal exposure as a result of his testimony at the defendant's trial. Additional facts will be set forth as necessary.

The record also reveals the following procedural history. The state charged the defendant in a two part substitute information with seven offenses stemming from the incident: (1) attempt to commit assault in the first degree in violation of General Statutes §§ 53a-59 (a) (1) and 53a-49 (a) (2); (2) carrying a pistol without a permit in violation of General Statutes § 29-35 (a); (3) having a weapon in a motor vehicle in violation of § 29-38 (a); (4) interfering with a peace officer in violation of General Statutes § 53a-167a (a); (5) using a motor vehicle without the owner's permission in violation of General Statutes § 53a-119b (a) (1); (6) reckless driving in violation of General Statutes § 14-222 (a); and (7) criminal possession of a firearm in violation of § 53a-217 (a).

After two days of evidence, the trial court granted the defendant's motion for a judgment of acquittal on the charge of carrying a pistol without a permit, stating that "the court certainly heard evidence from which a jury could conclude that [the defendant] constructively possessed the gun" but not that she had "carried [the firearm] on . . . her person," as required by § 29-

---

[3] Pursuant to *North Carolina* v. *Alford*, 400 U.S. 25, 37, 91 S. Ct. 160, 27 L. Ed. 2d 162 (1970), a defendant who enters a guilty plea does not admit guilt but, rather, acknowledges that the state's case is so strong that he is willing to enter a plea of guilty.

State *v.* Rhodes

35 (a).[4] The jury found the defendant not guilty of attempted assault and interfering with an officer but found her guilty of having a weapon in a motor vehicle, using a motor vehicle without the owner's permission, and reckless driving. The jury then separately heard evidence of the defendant's prior convictions for the sale of hallucinogens or narcotics in violation of General Statutes § 21a-277 (a) and stealing a firearm in violation of General Statutes § 53a-212, and found her guilty of criminal possession of a firearm.

The defendant appealed to the Appellate Court, and the appeal was transferred to this court. See General Statutes § 51-199 (c); Practice Book § 65-1. On appeal, the defendant challenges her conviction of criminal possession of a firearm and having a weapon in a motor vehicle.[5] We reject both of these claims.

I

The defendant claims first on appeal that the state failed to prove beyond a reasonable doubt that she "possessed" a firearm and, therefore, that there was insufficient evidence to convict her of criminal possession of a firearm under § 53a-217 (a). She argues that the evidence established only that she and the firearm were in the same car at the same time and that, on the basis of this alone, the jury could not reasonably infer that she possessed the firearm. We disagree and conclude that the record contains sufficient circumstantial evidence, beyond mere proximity, that the defendant knew the firearm was in the car, was in a position to control it, and intended to control it. We therefore conclude that there was sufficient evidence from which the jury reasonably could have found that the defendant constructively possessed a firearm.

---

[4] General Statutes § 29-35 (a) provides in relevant part: "No person shall carry any pistol or revolver upon his or her person, except when such person is within the dwelling house or place of business of such person, without a permit to carry the same issued as provided in section 29-28. . . ."

[5] The defendant does not challenge her conviction of using a motor vehicle without the owner's permission and reckless driving.

State *v.* Rhodes

"A party challenging the validity of the jury's verdict on grounds that there was insufficient evidence to support such a result carries a difficult burden." (Internal quotation marks omitted.) *Gagliano* v. *Advanced Specialty Care, P.C.*, 329 Conn. 745, 754, 189 A.3d 587 (2018). In particular, before this court may overturn a jury verdict for insufficient evidence, it must conclude that "no reasonable jury" could arrive at the conclusion the jury did. *State* v. *Terwilliger*, 314 Conn. 618, 660, 104 A.3d 638 (2014). Although "the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense . . . each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Taupier*, supra, 330 Conn. 187.

## A

### 1

A defendant is guilty of criminal possession of a firearm if (1) the defendant "possesses" a firearm, (2) the defendant is a convicted felon, and (3) the firearm is operable.[6] The defendant disputes only whether she "possessed" the firearm for purposes of § 53a-217 (a).

" 'Possess' means to have physical possession or otherwise to exercise dominion or control over tangible property . . . ." General Statutes § 53a-3 (2). Therefore, possession may be actual or constructive. See, e.g., *State* v. *Butler*, 296 Conn. 62, 77, 993 A.2d 970 (2010). This court consistently has held that constructive possession is "possession without direct physical contact." (Internal quotation marks omitted.) *State* v. *Johnson*, 316 Conn. 45, 58, 111 A.3d 436 (2015). It can mean "an appreciable ability to guide the destiny of the

---

[6] General Statutes (Rev. to 2013) § 53a-217 (a) provides in relevant part: "A person is guilty of criminal possession of a firearm or electronic defense weapon when such person possesses a firearm or electronic defense weapon and . . . has been convicted of a felony . . . ."

State *v.* Rhodes

[contraband]''; (internal quotation marks omitted) id., 62; and ''contemplates a continuing relationship between the controlling entity and the object being controlled. Webster's Third New International Dictionary defines the noun 'control' as the *'power or authority to guide or manage.'* . . . [It] is not the manifestation of an act of control but instead it is the act of being in a *position of control* coupled with the requisite mental intent. . . . [T]his control must be exercised intentionally and with knowledge of the character of the controlled object.'' (Emphasis added.) *State* v. *Hill*, 201 Conn. 505, 516, 523 A.2d 1252 (1986).

In particular, and important to the defendant's claim, we have observed that ''[i]ntent is often inferred from conduct . . . and from the cumulative effect of the circumstantial evidence and the rational inferences drawn therefrom.'' (Internal quotation marks omitted.) *State* v. *James E.*, supra, 327 Conn. 218. So, too, can knowledge of the contraband and an intent to control it be inferred. See *State* v. *Simino*, 200 Conn. 113, 119, 509 A.2d 1039 (1986) (knowledge is ''[o]rdinarily'' inferred). However, ''mere control or dominion over the place in which the contraband is found is not enough to establish constructive possession . . . . [T]he government is required to present direct or circumstantial evidence to show some connection or nexus individually linking the defendant to the contraband.'' (Internal quotation marks omitted.) *State* v. *Johnson*, supra, 316 Conn. 62. Under the doctrine of nonexclusive possession, more than one person can possess contraband. *State* v. *Williams*, 258 Conn. 1, 7, 778 A.2d 186 (2001). However, ''[w]here the defendant is not in exclusive possession of the premises where the [contraband is] found, it may not be inferred that [the defendant] knew of the presence of the [contraband] and had control of [it], unless there are other incriminating statements or circumstances tending to buttress such an inference.'' (Internal quotation marks omitted.) Id.

State *v.* Rhodes

2

Notably, the defendant has not raised a claim of vagueness or instructional error. See *State* v. *Luurtsema*, 262 Conn. 179, 204, 811 A.2d 223 (2002) (declining to address potential vagueness challenge to criminal statute because "defendant has attacked only the sufficiency of the evidence . . . without reference whatsoever to the constitutionality of the . . . statute"), overruled in part on other grounds by *State* v. *Salamon*, 287 Conn. 509, 513–14, 949 A.2d 1092 (2008). She also does not argue, even with respect to her insufficiency claim, that this court should revisit the definition of "constructive possession" that we consistently have applied. In fact, the language we cite appears almost verbatim throughout her brief, which is consistent with both the statutory definition of possession in our Penal Code; General Statutes § 53a-3 (2); and with our prior decisions interpreting that definition, which were based on our well settled principles of statutory interpretation. See, e.g., *State* v. *Hill*, supra, 201 Conn. 516 (defining "control" under § 53a-3 (2) as "power or authority to guide or manage" (internal quotation marks omitted)).[7] In addressing the jury, the prosecutor, defense counsel, and the trial court all referred to this as the practical ability of the defendant to "go and get" the gun, or the practical ability to obtain actual physical possession of

---

[7] In *State* v. *Hill*, supra, 201 Conn. 505, we went on to conclude: "The New York construction of an identical statute, however, combined with our approval of the same interpretation in a related context . . . and the common usage of the phrase 'to exercise dominion or control,' ineluctably lead[s] us to conclude that the trial judge's instructions in the present case were not erroneous." (Citation omitted.) Id., 517; see also *People* v. *Manini*, 79 N.Y.2d 561, 573, 594 N.E.2d 563, 584 N.Y.S.2d 282 (1992) ("the [p]eople must show that the defendant exercised 'dominion or control' over the property by a sufficient level of control over the area in which the contraband is found"); *United States* v. *Brown*, 422 F.3d 689, 692 (8th Cir. 2005) ("[c]onstructive possession of the firearm is established if the defendant [had] dominion over the premises where the firearm was located" (internal quotation marks omitted)).

State *v.* Rhodes

it. Defense counsel made the defendant's physical access to the gun the sole point of his closing argument, focusing specifically and exclusively on whether the gun "was in a place where the defendant could, if she wishes, go and get it . . . ."[8] The prosecutor responded to defense counsel in rebuttal argument,[9] and the court instructed the jury on this theory.[10]

We agree with the United States Court of Appeals for the District of Columbia Circuit that this standard appropriately accounts for the deference we must afford to the jury and the practical problems of proof in the nonexclusive possession context: "[W]e would adhere to that concept in preference to artificial rules restricting evidence-sufficiency rules that would inevitably invade the traditional province of the jury . . . . The judge's task intensifies . . . when the accused's relationship to the premises is shared with others, and consequently the problems of knowledge and control intensify. . . . [I]n full recognition of the increased difficulties that the [g]overnment then faces, we reiterate that the sufficiency of the evidence for jury consideration depends upon its capability plausibly to suggest the likelihood that in some discernible fashion the accused had a *substantial voice vis-à-vis* the [contra-

---

[8] In his closing argument, defense counsel made the following statements about the defendant's physical access to the gun: "As long as the object is or was in a place where the defendant could, if she wishes, could go and get it, it is in her possession"; "[the defendant has constructive possession] [a]s long as the object is or was in a place where the defendant, if she wishes to, could go and get it"; "could [the defendant] get that gun?"; "[t]here's no information that was presented to you that . . . she can go and get it"; and, "[d]o you think that [Spann] would relinquish that weapon?"

[9] In his rebuttal argument, the prosecutor stated: "It's a Chevy Impala, this is not—it's a limited space. You have pictures of the car. Could she get it? It's right there in the car where she is. She's—she can exercise dominion and control within this relatively small space of the interior of the Chevy Impala."

[10] The court instructed the jury in part: "As long as the object is or was in a place where the defendant could, if she wishes, go and get it, it is in her possession"; the court repeated the instruction after a question from the jury during its deliberations.

State *v.* Rhodes

band].'' (Emphasis added; footnotes omitted.) *United States* v. *Staten*, 581 F.2d 878, 883–84 (D.C. Cir. 1978). Because the defendant has not asked us to depart from it, and because we are bound by our legislature's definitions and prior decisions of this court, we adhere to our settled understanding of constructive possession.

B

With respect to the facts of the present case, the defendant's challenge is to the sufficiency of the evidence in accordance with established Connecticut law. The record clearly entitled the jury to find that the defendant possessed the car she was driving.[11] Thus, the issue is whether it was reasonable for the jury to infer that she also possessed the firearm within the car.

A case for constructive possession of a firearm often is necessarily built on inferences, and a jury ''may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical.'' (Internal quotation marks omitted.) *State* v.

---

[11] Apart from disputing her intent to control the firearm, the defendant appears to argue that she even may have lacked the intent to control the car during the chase. At trial, her counsel argued to the jury that she merely was following Spann's orders to drive away from the shooting. Similarly, in her reply brief and at oral argument before this court, her appellate counsel argued that she had no choice but to drive away after the shooting out of fear for her personal safety. The defendant did not raise the affirmative defense of duress in the trial court, however, and, in fact, specifically disclaimed it. The trial court therefore did not instruct the jury on duress. We are not bound to consider a claim not raised until the defendant's reply brief and oral argument. See *State* v. *Jose G.*, 290 Conn. 331, 341 n.8, 963 A.2d 42 (2009); *Grimm* v. *Grimm*, 276 Conn. 377, 393, 886 A.2d 391 (2005), cert. denied, 547 U.S. 1148, 126 S. Ct. 2296, 164 L. Ed. 2d 815 (2006). Nonetheless, her counsel argued to the jury that she was merely following Spann's orders to drive away from the shooting. The jury quite clearly rejected this argument. At any rate, the issue of intent to control the gun pervaded the trial and was for the jury to determine. Given that she continued to drive the car after the shooting until it crashed, we are not persuaded that the evidence, viewed in the light most favorable to sustaining the verdict, prevented the jury from rejecting the argument that she was acting strictly at Spann's behest and finding instead that she intended to control the car.

State *v.* Rhodes

*James E.*, supra, 327 Conn. 218. A jury also "may draw factual inferences on the basis of already inferred facts." (Internal quotation marks omitted.) *State* v. *Coccomo*, 302 Conn. 664, 670, 31 A.3d 1012 (2011).

The "line between permissible inference and impermissible speculation is not always easy to discern." (Internal quotation marks omitted.) *State* v. *Lewis*, 303 Conn. 760, 768, 36 A.3d 670 (2012). "[P]roof of a material fact by inference from circumstantial evidence need not be so conclusive as to exclude every other hypothesis," but it must suffice to produce "in the mind of the trier a reasonable belief in the probability of the existence of the material fact." (Internal quotation marks omitted.) *State* v. *Copas*, 252 Conn. 318, 339–40, 746 A.2d 761 (2000). "When we infer, we derive a conclusion from proven facts because such considerations as experience, or history, or science have demonstrated that there is a likely correlation between those facts and the conclusion. If that correlation is sufficiently compelling, the inference is reasonable. But if the correlation between the facts and the conclusion is slight, or if a different conclusion is more closely correlated with the facts than the chosen conclusion, the inference is less reasonable. At some point, the link between the facts and the conclusion becomes so tenuous that we call it speculation. When that point is reached is, frankly, a matter of judgment." (Internal quotation marks omitted.) *State* v. *Lewis*, supra, 768–69. We therefore also must bear in mind that "jurors are not expected to lay aside matters of common knowledge or their own observations and experiences . . . . [C]ommon sense does not take flight when one enters a courtroom." (Citation omitted; internal quotation marks omitted.) *State* v. *Otto*, 305 Conn. 51, 70 n.17, 43 A.3d 629 (2012).

Our review of the evidence finds several "circumstances tending to buttress . . . an inference"; (internal quotation marks omitted) *State* v. *Williams*, supra,

State *v.* Rhodes

258 Conn. 7; that the defendant had the knowledge of
and intent to control the firearm that our law requires
for a finding of constructive possession, including facts
and inferences that reasonably permitted the jury to
conclude that, in all probability, she had the ability to
"go and get" the gun.

1

There was no serious argument at trial that the defen-
dant lacked knowledge of the gun. At the very least, the
jury reasonably could have inferred from the evidence
that, by the time of the car chase, the defendant knew that
a gun was in the vehicle. Spann exited the car openly
carrying the firearm in his hand and fired multiple gun-
shots within no more than twenty feet of the car. In his
testimony, Spann acknowledged that the defendant
"[p]robably" heard the gunshots.[12] Spann also testified
that he got back into the car with the gun. Spann's tes-
timony was corroborated, in part, by the testimony of

---

[12] It is undisputed that Spann fired the gun after exiting the car, but he
and other witnesses gave conflicting accounts of the details. According to
Spann himself, he exited the Impala with the gun in his hand, walked behind
the car, and spoke to some acquaintances for five to ten minutes. Then,
standing about twenty feet from the car, he fired two or three gunshots up
in the air, then "[c]almly, coolly" walked to the car, and got back in. Although
Spann testified that the defendant "[p]robably" heard the gunshots and was
"shocked" when he reentered the car, he initially claimed that she did not
know he was carrying a gun at this point. Later in his testimony, however,
he conceded that "[m]aybe" the defendant knew he had a gun by this time.

Three witnesses contradicted the specifics of Spann's story. Two Bridge-
port police officers each claimed to have witnessed the shooting from a
patrol car parked a few buildings away from where the defendant stopped
the car. They testified that Spann fired almost immediately after getting out
of the Impala, that he was only a few steps outside of the car when he did
so, that he aimed toward either a crowd of people or a building, and that
he fired five gunshots. The third witness, a forensics expert, confirmed that
five shell casings were found at the scene and that each had been fired
from the same nine millimeter semiautomatic handgun. He did not testify as
to whether the casings were fired specifically from Spann's gun, presumably
because the gun was never recovered. The jury reasonably could have chosen
to believe these witnesses instead of Spann.

State *v.* Rhodes

the police officers who witnessed the shooting and testified that, immediately after firing his weapon, Spann entered the vehicle.

Additionally, the defendant likely knew Spann was a drug dealer and, therefore, that he often carried a gun. See, e.g., *State* v. *Clark*, 255 Conn. 268, 284, 764 A.2d 1251 (2001) ("Connecticut courts repeatedly have noted that [t]here is a well established correlation between drug dealing and firearms" (internal quotation marks omitted)). The jury is permitted to "rely on its common sense, experience and knowledge of human nature in drawing inferences"; *State* v. *Rodgers*, 198 Conn. 53, 59, 502 A.2d 360 (1985); and "may draw factual inferences on the basis of already inferred facts." (Internal quotation marks omitted.) *State* v. *Coccomo*, supra, 302 Conn. 670. On the basis of the defendant's knowledge that Spann was a drug dealer who often carried a gun, it was not "so unreasonable [an inference] as to be unjustifiable" for the jury to infer that she knew that he possessed a gun in the car. (Internal quotation marks omitted.) Id. This evidence and the inferences that reasonably could be drawn therefrom make it impossible for this court to conclude that "no reasonable jury" could have found that the defendant had knowledge of the gun. Thus, the jury reasonably could have inferred that, at the very least, the defendant became aware that the firearm was in the car after the shooting.

2

Our review of the record in the light most favorable to sustaining the verdict leads us to find at least four circumstances, which the jury could have reasonably relied on, that "tend[ed] to buttress . . . an inference"; (internal quotation marks omitted) *State* v. *Williams*, supra, 258 Conn. 7; that the defendant was intentionally "in a position of control" over the gun; *State* v. *Hill*, supra, 201 Conn. 516; or did exercise control over the gun: her control of the car, her flight from the police,

State *v.* Rhodes

her relationship with Spann, and her physical access to the gun. We discuss each in turn.

First, the fact that the defendant was driving, and thereby controlling, the car that she knew contained the gun suggests that she was able to and intended to control the gun. Although we are mindful that "mere control or dominion over the place in which the contraband is found is not enough to establish constructive possession"[13] and that "some connection or nexus individually linking the defendant to the contraband" is required; (internal quotation marks omitted) *State* v. *Johnson*, supra, 316 Conn. 62; the facts and circumstances of this case provided the jury with ample justification to conclude that the defendant's control of the car, at least in part, supported the jury's conclusion that she also controlled the firearm. Coupled with other evidence, "[o]ne who owns or exercises dominion or control over a motor vehicle in which [contraband] is concealed may be deemed to possess the contraband." (Internal quo-

_____

[13] Our conclusion on these facts does not suggest that the driver of a vehicle is deemed to be in constructive possession of every item she knows to be in a passenger's actual possession. Intent to control *contraband*—an element of constructive possession in Connecticut—may not be inferred "unless there are other incriminating statements or circumstances tending to buttress such an inference." (Internal quotation marks omitted.) *State* v. *Williams*, supra, 258 Conn. 7. Driving the vehicle in which the contraband is located is *one* such circumstance, but we have not suggested that it is dispositive. See, e.g., *State* v. *Martin*, 285 Conn. 135, 149–50, 939 A.2d 524 ("[o]ne factor that may be considered in determining whether a defendant is in constructive possession of [contraband] is whether he is in possession of the premises where the [contraband is] found" (internal quotation marks omitted)), cert. denied, 555 U.S. 859, 129 S. Ct. 133, 172 L. Ed. 2d 101 (2008).

In the present case, additional circumstances under which the defendant operated the vehicle—most notably, that she drove the vehicle to the place where Spann discharged the gun, waited for him to get back in the vehicle with the gun after the shooting, notwithstanding that she was a felon, and drove the vehicle 1.2 miles while being chased by the police in an effort to evade arrest for her participation in the shooting—in our view clearly buttressed an inference of an intent to control the gun contained within the vehicle but perhaps would not support an intent to control, for instance, Spann's cell phone or wallet.

tation marks omitted.) *State* v. *Delossantos*, 211 Conn. 258, 277–78, 559 A.2d 164, cert. denied, 493 U.S. 866, 110 S. Ct. 188, 107 L. Ed. 2d 142 (1989); see, e.g., *State* v. *Winfrey*, 302 Conn. 195, 211, 24 A.3d 1218 (2011) (fact that defendant was driving vehicle in which contraband was found supported inference of constructive possession of that contraband); *State* v. *Bowens*, 118 Conn. App. 112, 123, 982 A.2d 1089 (2009) ("defendant was driving the [car] containing the revolver, which itself suggests control of the firearm"), cert. denied, 295 Conn. 902, 988 A.2d 878 (2010); *State* v. *Sanchez*, 75 Conn. App. 223, 241, 815 A.2d 242 ("[t]he drugs were found in a car [the defendant] was operating and, thus, had control over"), cert. denied, 263 Conn. 914, 821 A.2d 769 (2003).

Second, after Spann had discharged the weapon, the defendant attempted to evade the police, who had begun pursuit, first in the car and then on foot. The jury reasonably could have found that these attempts at flight, coming right after Spann had fired the gun and gotten back in the car, indicated a consciousness of guilt stemming from her knowledge of and intent to exercise control over the gun, leading the jury to find that she possessed it. Specifically, the jury reasonably could have inferred that her maneuver around the patrol car and the ensuing car chase were deliberate—and successful—efforts to prevent the police from finding the firearm and, thus, exertions of dominion or control over it. See, e.g., *State* v. *Butler*, supra, 296 Conn. 79 (defendant's effort to "conceal" contraband supported inference of control); *State* v. *Bowens*, supra, 118 Conn. App. 124 (defendant's effort to "jettison the revolver" supported inference of control); *United States* v. *Chambers*, 918 F.2d 1455, 1458 (9th Cir. 1990) ("[c]onduct by the driver of a vehicle that appears intended to aid a passenger in disposing of the [contraband] is probative of joint possession").

State *v.* Rhodes

Notably, because of her prior felony convictions, the defendant had been expressly informed that it was illegal for her to possess a firearm[14]—a fact the prosecutor highlighted in his closing argument. The jury was asked to view the car chase in the context of the entire afternoon. Evidence about the periods before, during and after the car chase set forth throughout this opinion bolster the conclusion that the defendant—who disclaimed any argument that she acted under duress— was not just passively following orders when she sped away from the police, weaved around pedestrians, and passed multiple stop signs without stopping over the course of 1.2 miles. To the extent that the jury found her high-speed exit from the crime scene was an effort to escape capture, it reasonably could have inferred her consciousness of guilt on the basis of this evidence. See, e.g., *State* v. *Wright*, 198 Conn. 273, 281, 502 A.2d 911 (1986). "The probative value of evidence of flight depends upon all the facts and circumstances and is a question of fact for the jury." (Internal quotation marks omitted.) Id. Particularly in light of her knowledge that it was illegal for her to possess a gun, it was reasonable for the jury to infer that the defendant's flight was motivated by a belief that she had broken the law by possessing a gun and a desire to escape prosecution for it.

The concurring and dissenting justice takes issue with our conclusion that the record supports the jury's reasonable reliance on the defendant's flight as evidence supporting her intent to control the gun. He prefers his own alternative explanation for the defendant's leading the police on a 1.2 mile high-speed car chase, ending in a crash after which the defendant and Spann fled on foot separately. We are told there are several

---

[14] The shooting involved in this case is an excellent example of the reasons supporting the legislature's proscription of felons exercising control over guns.

State *v.* Rhodes

more benign reasons for her flight, including that she was helping Spann, that she feared Spann, that she feared the police or that she was escaping before another crime she had committed was discovered.[15] Defense counsel argued some of these alternative explanations to the jury. In the concurring and dissenting justice's view, the "least plausible" motive was a desire to exercise control over the gun. To judge the plausibility of these explanations, the concurring and dissenting justice relies on and credits the entirety of Spann's testimony, which, as we explain in part I B 3 of this opinion, the jury was not required to credit. Even if the record supported the concurring and dissenting justice's speculative accounting of the defendant's actions, this court consistently has explained that the possibility of other, innocent "inferences from these facts is not sufficient to undermine [the jury's] verdict . . . ." (Internal quotation marks omitted.) *State* v. *Otto*, supra, 305 Conn. 74. "[I]n viewing evidence [that] could yield contrary inferences, the jury is not barred from drawing those inferences consistent with guilt and is not required to draw only those inferences consistent with innocence." (Internal quotation marks omitted.) Id.[16]

---

[15] Without a hint of irony, the concurring and dissenting justice suggests that, after the defendant's friend, Spann, fired several gunshots on a city street, the defendant led the police on a dangerous high-speed chase because she was worried she might get pinched for unlawfully driving a car she had not rented herself.

[16] In support of his argument about flight, the concurring and dissenting justice cites *Alberty* v. *United States*, 162 U.S. 499, 510, 16 S. Ct. 864, 40 L. Ed. 1051 (1896), for the proposition that, when there are " 'so many reasons' " for the defendant's flight, evidence of flight does not establish guilt. *Alberty* is distinguishable. It was not a sufficiency of the evidence case. Rather, it concerned a jury instruction that "created a legal presumption of guilt so strong and so conclusive that it was the duty of the jury to act on it as axiomatic truth . . . ." Id. There was no such instruction given or challenged in this case. In fact, the concurring and dissenting justice quotes selectively from *Alberty*, which recognized that the weight of flight evidence is up to the jury: "[B]ut [flight] and similar evidence has been allowed upon the theory that the jury will give it such weight as it deserves, depending upon the surrounding circumstances." (Internal quotation marks omitted.) Id. In

State *v.* Rhodes

Third, the state's overarching theory of the whole
case was that the defendant intended to facilitate the
shooting by acting as Spann's getaway driver. The pros-
ecutor specifically asked the jury to draw this inference
on the basis of evidence of the defendant's yearslong
friendship with Spann. The evidence was not just that
she associated with a known criminal. Rather, she had
made recent trips to the car rental agency with Spann.
Spann trusted her enough to allow her to drive the car
he rented in his name on the day of the incident.[17] Spann
began shooting almost immediately upon getting out of
the car, and the defendant waited for Spann to get back
in the car after she witnessed the shooting and then
drove him from the scene. She could have driven away
without him. Instead, she fled from the police, both
with Spann and then apart from him, after crashing the
car.[18] From all of the evidence, the jury reasonably could

the present case, the jury was instructed consistent with the holding in
*Alberty*: "The [s]tate claims that the defendant fled from the scene of the
shooting, that she engaged in a police pursuit, and ran from the vehicle
. . . . It is for you to decide what that conduct was and what the defendant's
purpose or reason was for acting as she did."

[17] Applying its common sense, the jury likely knew that most rental agree-
ments do not permit a person to drive a car rented in another's name. The
jury heard evidence that this rental agreement was no exception.

[18] Critical to his insufficiency point, the concurring and dissenting justice
insists that the state did not argue its getaway driver theory to the jury on
the gun possession charge but only on the attempted assault charge. He
attempts to use the jury's acquittal of the defendant on the attempted assault
charge to suggest that the jury did not find, on the basis of the evidence of
the defendant's close relationship with Spann, that the defendant was the
getaway driver as support for its determination that the defendant construc-
tively possessed the gun. This ignores the record and a fundamental maxim
of appellate review.

The trial court bifurcated the trial, submitting the criminal possession
charge to the jury after it had returned a verdict on the other charges,
including finding the defendant not guilty on the charges of attempted assault
and interfering with a police officer. Although the prosecutor specifically
made the getaway driver argument in his closing relating to the charges the
jury first considered, and did not directly repeat it in his closing argument
relating to the possession charge, he did argue in connection with the
possession charge that the defendant was "well aware of the gun . . . before
the shots were discharged" and that the jury could find joint possession,

State *v.* Rhodes

have inferred that the defendant and Spann were not just close friends but willing partners in a joint criminal venture: specifically, that she was driving him and his

both of which suggest that the shooting was a collaborative effort. Moreover, the prosecutor and the court both noted that the jury could rely on evidence from the first portion of the trial. Forced to admit that it was "not impossible" for the jury to have arrived at what the concurring and dissenting justice contends were inconsistent verdicts, the concurring and dissenting justice nonetheless insists that it was "unlikely, to say the least . . . ." But when we read the record in the light most favorable to sustaining the jury's verdict, the acquittal on the attempted assault charge was not at all factually inconsistent with the jury's guilty verdict on the possession charge, and surely not far-fetched. In fact, there is good reason to believe the jury did just as defense counsel implored it to do on the attempted assault charge, the most serious of the charges the defendant faced: found her not guilty for lack of intent, not because she was not the getaway driver.

An element of assault is intent to cause serious physical injury to another person. See General Statutes § 53a-59 (a) (1). Witnesses to the shooting gave conflicting testimony about where Spann was aiming when he fired the gun. The testimony of the two witnessing police officers was substantially similar in almost all respects but differed on this point—one officer said that Spann fired his gun in the direction of several pedestrians on the sidewalk; the other said that Spann fired toward a building. Spann himself testified that he fired up in the air. See footnote 12 of this opinion. This is not a testimonial discrepancy of an alternative theory the state would be expected to argue to the jury concerning the attempted assault charge— which exposed the defendant to the longest sentence among all of the charges. But defense counsel did make this very argument, underscoring this evidentiary discrepancy to the jury in closing, along with the absence of other eyewitness and forensic evidence of where Spann was aiming.

Finally, factually inconsistent jury verdicts are not just permissible, but unreviewable. See, e.g., *State* v. *Arroyo*, 292 Conn. 558, 585–86, 973 A.2d 1254 (2009) (claims of factual, logical and legal inconsistency between conviction and acquittal are not reviewable), cert. denied, 559 U.S. 911, 130 S. Ct. 1296, 175 L. Ed. 2d 1086 (2010). Rather, a court reviewing the sufficiency of the evidence on one count "should examine only whether the evidence provided sufficient support for the conviction, and not whether the conviction could be squared with verdicts on other counts." *State* v. *Blaine*, 168 Conn. App. 505, 512, 147 A.3d 1044 (2016), remanded in part on other grounds, 325 Conn. 918, 163 A.3d 618 (2017); see *State* v. *Arroyo*, supra, 576–83. The main thesis of the concurring and dissenting justice's alternative narrative—that the jury must have rejected the getaway driver theory in finding the defendant not guilty on the attempted assault charge—conflicts with this elementary rule. On this record, the jury reasonably could have concluded that the state failed to prove beyond a reasonable doubt that, like Spann, the defendant had the intent to cause serious physical injury to another person while still concluding that she and Spann brought the gun to Trumbull Avenue for the purpose of firing it and that the defendant would serve as the getaway driver. But regardless, that is not a question appropriately before us. The only question we may examine is whether there

State *v.* Rhodes

weapon to and from the scene of a shooting. "[A] defendant's knowing participation in a joint criminal venture in which a particular firearm is intended to play a central part permits the jury to reasonably conclude that the defendant constructively possessed that gun. . . . This is true even if the defendant never intended to use the firearm [her]self . . . ." (Citation omitted.) *United States* v. *Perez*, 661 F.3d 568, 576–77 (11th Cir. 2011), cert. denied, 566 U.S. 952, 132 S. Ct. 1943, 182 L. Ed. 2d 799 (2012), and cert. denied sub nom. *Davila* v. *United States*, 568 U.S. 874, 133 S. Ct. 355, 184 L. Ed. 2d 133 (2012); see, e.g., *State* v. *Williams*, 110 Conn. App. 778, 789, 956 A.2d 1176 (driver's "complicity with the occupants of the car in a criminal enterprise" supported inference of constructive possession), cert. denied, 289 Conn. 957, 961 A.2d 424 (2008); *Logan* v. *United States*, 489 A.2d 485, 492 (D.C. 1985) (evidence that driver "acted in concert" with passenger to dispose of firearm supported inference of constructive possession); *United States* v. *Chambers*, supra, 918 F.2d 1458 (driver's conduct "intended to aid a passenger," and "cooperating" with passenger with actual possession supported inference of constructive possession); *United States* v. *Massey*, 687 F.2d 1348, 1354 (10th Cir. 1982) (evidence of "cooperative venture" and "working relationship" supported inference of constructive possession). That the defendant was the getaway driver, spiriting the gun and Spann away from the scene of the shooting, was a reasonable inference from these facts and supports a finding that the defendant intended to control the gun.[19]

Finally, the defendant sat within arm's reach of the gun throughout the afternoon. Spann testified to this.

was sufficient evidence for the jury to have found the defendant guilty on the criminal possession charge.

[19] Possession under these circumstances does not depend on a criminal conviction of a related offense. But, even if it did, the defendant was in fact convicted of related criminal offenses directly or indirectly involving the gun: having a weapon in a motor vehicle, using a motor vehicle without the owner's permission, and reckless driving.

State *v.* Rhodes

He also testified that, after firing the gun, he brought it back into the car and sat in the front passenger seat during the car chase, taking the gun with him when he fled from the police on foot after the crash. The two officers who witnessed the shooting corroborated Spann's account, testifying that, after the car stopped, Spann exited the car, fired the gun almost immediately, and reentered the car. Despite the defendant's having Spann testify in her defense, there was never any evidence that the gun was anywhere other than in the area of the front seat, and, therefore, the jury reasonably could have inferred that she was physically "in a position of control" over it, given her proximity to the gun. *State* v. *Hill*, supra, 201 Conn. 516; cf. *State* v. *Boyd*, 115 Conn. App. 556, 568, 973 A.2d 138 (evidence that contraband was found " 'right at [defendant's] feet' " supported inference of constructive possession), cert. denied, 293 Conn. 912, 978 A.2d 1110 (2009); *State* v. *Williams*, supra, 110 Conn. App. 787–88 (evidence that contraband was "within arm's reach" of defendant supported inference of constructive possession). There was no evidence that the gun was anywhere other than in the front passenger seat area at all relevant times, and the defendant does not contend otherwise.

On the basis of these four inferences, we cannot conclude that "no reasonable jury" could have found that the defendant was in a position of control over the gun. The concurring and dissenting justice disagrees, arguing that there was no evidence of particular facts—such as that the defendant was involved in Spann's drug enterprise or that the defendant previously had handled the gun— that would have established a link between the defendant and the gun. Although such facts might have helped to establish constructive possession, the absence of this evidence does not require the conclusion that there was insufficient evidence. See, e.g., *State* v. *Ayala*, 333 Conn. 225, 236, 215 A.3d 116 (2019) (although physical evidence linking defendant to murder would have made state's case stronger, lack of such evidence did not necessarily render state's case weak).

State *v.* Rhodes

3

If the defendant were alone in the car and knew a gun was located in the front seat area—for example, if Spann had fired the gun and placed it under the passenger seat of the car, between the seats or in the trash receptacle of the passenger's door, but did not get in the car, and the defendant sped away—there would be no serious argument that the defendant could not "go and get" the gun and, therefore, that she possessed the gun. However, the defendant responds that Spann's testimony that he had exclusive possession of the gun prevented the jury from finding that she was in a position of control over the gun. Specifically, she contends that the pains Spann asserts he took to hide the gun from her defeat the state's attempt to prove her guilty of the possession charge.

The defendant called Spann as a witness in an effort to exonerate her on the gun possession charge on the basis of his testimony that the gun was with him in the front passenger seat and in his exclusive possession during the entire ninety minutes he and the defendant were in the car before the shooting, as well as after the shooting. Specifically, Spann testified that he actively hid or kept the gun from the defendant all afternoon by sitting on it, holding it or keeping it next to him between the seat and the passenger's side door. The jury did not have to credit this evidence, however, which was based entirely on the testimony of an unreliable witness and was at odds with the rest of the evidence of the day's events and the relationship between Spann and the defendant, which suggested that their interests were aligned.

In fact, staking the success of her defense on Spann's testimony could very well have backfired on the defendant. Spann's testimony can be seen as a textbook example of a case of a jury exercising its prerogative to "credit part of a witness' testimony and [to] reject

State *v.* Rhodes

other parts.'' *Hicks* v. *State*, 287 Conn. 421, 435, 948 A.2d 982 (2008). Specifically, the jury was entitled to credit Spann's testimony that the gun was located in the area of the front seat while discrediting his claims that he physically held the gun in a way that prevented the defendant from accessing it, such as by keeping it hidden ''under [his] lap'' the whole time or by holding it ''on the side of [him] . . . in between the seat and the door'' during the car chase.

Spann was hardly a credible witness. The jury heard that he previously had lied to the police about the incident (e.g., his false claim that the Impala had been stolen) and heard about his potential biases (e.g., that he only came forward to exonerate the defendant after his own conviction and sentencing and, thus, testified without the threat of additional criminal exposure). The jury also heard several inconsistencies within his own testimony (e.g., his inconsistent responses about whether the defendant knew he had a gun) and the contradictory testimony of other witnesses (e.g., his testimony that he fired the gunshots five to ten minutes after getting out of the car against the testimony of two police officers that he fired almost immediately after getting out of the car). The jury repeatedly was made aware of these credibility issues throughout the questioning and reminded of them during the prosecutor's summations.

The jury had good reason to question Spann's credibility: it reasonably could have found his testimony evasive or, at best, ambiguous,[20] and his story about the

[20] Spann's testimony that the gun was between his passenger seat and the side door during the car chase was ambiguous as to whether he was physically holding the gun. The following colloquy occurred during the prosecutor's cross-examination of Spann:

''Q. All right. So, you fire off these shots. You agree the noise is so much she would have heard. You get back in the car, tell her to go, go, go. And the gun's still in your hand?

''A. It was on the side of me.

''Q. It's in your hand, it's not underneath you like it was when you were driving around for forty-five minutes with the gun under your lap?

State *v.* Rhodes

gun's location not just unbelievable and uncorroborated, but risible. His tale seeking to exonerate the defendant, including his claim that, for the ninety minutes he was with the defendant in the car that day, he assiduously kept the gun where she could not get it, including by sitting on it for stretches of time, strained credibility. Given their relationship, the jury was entitled to view this explanation with skepticism.[21]

This is an excellent example of why we repeatedly admonish appellate courts to leave credibility determinations to the jury and not become a " 'seventh juror' . . . ." *State* v. *Ford*, 230 Conn. 686, 693, 646 A.2d 147

---

"A. No, it was on the side—it was on the side of the door. Like on the side—in between the seat and the door."

[21] Because the defendant—not the state—called Spann as a witness, this is not a case in which the danger arises that the state might make its case simply by "calling [its] adversary and arguing to the jury that he was not to be believed." *Janigan* v. *Taylor*, 344 F.2d 781, 784–85 (1st Cir.), cert. denied, 382 U.S. 879, 86 S. Ct. 163, 15 L. Ed. 2d 120 (1965). This risk is the main justification for the rule, sometimes referred to as the "antithesis inference," that, when there is no "positive evidence" otherwise supporting the witness' testimony, the jury is not free to infer the opposite of what the witness testified simply because it disbelieved Spann. See, e.g., *State* v. *Alfonso*, 195 Conn. 624, 634, 490 A.2d 75 (1985); *Edwards* v. *Grace Hospital Society*, 130 Conn. 568, 575, 36 A.2d 273 (1944). That is not what occurred here. Spann himself indicated that the gun was located in a part of the car (the area of the front passenger seat) where the defendant could "go and get it" but for Spann's supposed efforts to prevent her from doing so. That was the "positive evidence." Spann's testimony that he immediately got back into the car after firing his weapon was corroborated by the police officers' testimony. The jury could have believed the "positive evidence" of the gun's location without believing Spann's account of his preventative efforts.

The other main reason for barring an antithesis inference is also absent here: reliance on demeanor evidence. If a jury concluded that a witness was lying on the basis of demeanor alone, and inferred the opposite of what the witness claimed, an appellate court would not be able to judge the sufficiency of that inference; on review, nothing in the record could support it. See *State* v. *Hart*, 221 Conn. 595, 605–606, 605 A.2d 1366 (1992) ("[o]ur rule barring the inference of the opposite of testimony . . . is an evidentiary issue concerning the proper method of measuring the sufficiency of the evidence" (citations omitted)). Here, however, we do not have to resort to Spann's demeanor for evidence of his lack of credibility. As previously discussed—and more importantly, in the transcript—the jury heard Spann admit that he had lied to the police about the same incident, admit that he had a motive to be untruthful, provide inconsistent responses to questioning, and contradict the testimony of other witnesses.

State *v.* Rhodes

(1994); see id. (''[w]e do not sit as the 'seventh juror' when we review the sufficiency of the evidence''). The prosecutor's examination is peppered with frustration and acerbic exchanges as Spann engaged in evasion, sarcasm or flippancy, or so the jury reasonably could have found. In relevant part, the transcript reads:

''Q. All right. Now, you're familiar with the sound that firearms make, correct?

''A. Mm-hmm.

''Q. And you'd agree that from twenty feet away, you can hear a nine millimeter being fired?

''A. *Probably.*

''Q. All right. So, you fired the shots and then get back in the car?

''A. Yeah.

''Q. And when you get back in the car, the gun's not underneath your—your—the gun's in your hand, still, when you get back in the car?

''A. Yeah.

''Q. So, at that point, [the defendant] knows you have a gun? Right?

''A. Well—

''Q. It's a yes or no question.

''A. *Maybe.*

''Q. *Come on. You just fired two or three shots*, you get back in the car, you're yelling at her to go—

''A. I wasn't yelling—

''Q. You—she knows what you do for a living, right?

''A. I mean, I didn't yell at her.

''Q. But she knows what you do for a living, right?

''A. Say that again.

State *v.* Rhodes

"Q. She knows what you do for a living?

"A. *Maybe.*" (Emphasis added.)

The reader can be forgiven for imagining the jurors' eyes rolling during this exchange.[22]

[22] Other examples of Spann's recalcitrance abound, making it hard to imagine that the jury believed much of his testimony in the defendant's defense. Here is one example the jury could have justifiably found to be not just eye-rolling but sidesplitting. Critical to Spann's exoneration of the defendant on the criminal possession charge was that she did not have physical access to the gun or, in the words of defense counsel and the jury instructions, that she could not "go and get it . . . ." So, Spann went to great lengths to insist there was no way the defendant could "go and get" the gun. The following colloquy occurred during the prosecutor's cross-examination of Spann:

"Q. Okay. So, after being out of the car for five to ten minutes, you then remove the nine millimeter from where you had it?

"A. I—I got—I removed it, when I got out of the car. When I got out [of] the car, I took it with me.

"Q. Oh, okay. So, it was not on your person in the car?

"A. It was under my lap, so, when I got out, I took it with me.

"Q. What do you mean, under your lap? You were sitting on it?

"A. Yeah.

"Q. You were sitting on a gun?

"A. Yeah.

"Q. That had to be uncomfortable?

"A. It's not that uncomfortable.

"Q. Driving around for forty-five minutes with a piece of metal under you?

"A. It's not that uncomfortable.

"Q. All right. So—so, you get out of the car and you have to reach back to get the gun off—off the seat?

"A. No.

"Q. Okay. And before you get out of the car, you have to reach under your lap to pull the gun out?

"A. No.

"Q. Hmm. All right. How does the gun then get from under your lap to into your hand?

"A. Open the door, and when I get out, I—it's all one motion. Just—

"Q. Okay.

"A. Yeah.

"Q. With your right hand?

"A. Yeah.

"Q. And then you put the gun in your waistband?

"A. I held it in my hand.

"Q. Okay. So, you get out of the car holding this gun in your hand?

"A. Yeah." (Emphasis added.)

The concurring and dissenting justice and the majority agree that identifying the line between fair inference and speculation is challenging. We obviously both believe that the other engages in speculation. Ironically, it is at this part of our opinion—where we recount in great detail Spann's

State *v.* Rhodes

In considering this testimony, which the defendant advanced for the jury's consideration, the jury reasonably could have questioned why Spann would go to such lengths to prevent her from having access to the gun. Was he afraid she would use the gun on him? There was no evidence of this. Was he anticipating getting caught and wanting to ensure that she had no criminal liability, or that he would? Using common sense, as the state urged in evaluating this after-the-fact,[23] concocted story, the jury could have rejected that he was that noble,[24] or prescient. In fact, that Spann would have

*actual* testimony, not repackaged descriptions of his testimony—that we are accused of "appellate storytelling," "conjur[ing] a basis for the jury's verdict" and "engag[ing] in a fictional account of the jury's conduct . . . ." The objective reader will have to decide who is telling stories. The point our opinion emphasizes is that, reading the record in the light most favorable to sustaining the verdict, not this court but the *jury* had good reason to question Spann's credibility; the *jury* reasonably could have found Spann's testimony evasive, ambiguous, sarcastic or flippant; and the *jury* could have found his tale exculpating the defendant "risible." To accept Spann's testimony at face value, as the concurring and dissenting justice does, is simply to substitute a different account than the jury was entitled to believe. It is true that an inference is permissible only "if the evidence produces *in the mind of the trier* [*of fact*] a reasonable belief in the probability of the existence of the material fact." (Emphasis altered; internal quotation marks omitted.) *State* v. *Reynolds*, 264 Conn. 1, 97, 836 A.2d 224 (2003), cert. denied, 541 U.S. 908, 124 S. Ct. 1614, 158 L. Ed. 2d 254 (2004). The key for an appellate court is that the "reasonable belief in the probability" of that fact is for the *trier* to determine. Appellate review of the trier's determination requires studied objectivity. Otherwise, we are simply substituting our view of probability for the trier's. Proof of a material fact "by inference from circumstantial evidence need not be so conclusive as to exclude every other hypothesis." (Internal quotation marks omitted.) Id. Simply because an appellate court can conceive of other possible factual scenarios does not mean that the jury's determination crosses the line from inference into speculation. We may reverse only if the trier's determination of that probability is "so unreasonable [an inference] as to be unjustifiable." (Internal quotation marks omitted.) *State* v. *Coccomo*, supra, 302 Conn. 670.

[23] As support that this version of events was concocted after the fact, immediately after the crash, Spann reported the car stolen to the Bridgeport Police Department. Spann admitted that he lied about the car being stolen. Spann also admitted that he never called the police to provide information that would have shielded the defendant from liability. For example, he never informed the police that the defendant did not know about the gun in the car and had nothing to do with the shooting.

[24] In fact, Spann wore his lack of altruism on his sleeve before the jury. Witness this exchange between the prosecutor and Spann about why, after Spann ditched the gun in a neighborhood yard while eluding the police, he did not go back and recover it or warn others:

State *v.* Rhodes

felt the need to hide or keep the gun from the defendant is at odds with evidence suggesting that his and the defendant's interests were aligned. For example, the jury heard that Spann and the defendant had a years long friendship; they had recently gone to the car rental agency together at least once and possibly multiple times regarding the Impala; Spann knew where the defendant lived and drove there to pick her up; Spann trusted the defendant enough to let her drive a car rented in his name; Spann and the defendant had spent the previous ninety minutes together in the car; and the defendant waited for Spann to get back in the car after the shooting before fleeing from the police. Conversely, no evidence (other than Spann's claims) suggested that he would have felt the need to keep or hide the gun from the defendant.

If the jury in fact rejected Spann's uncorroborated claim of exclusive possession, not believing that for every moment of the afternoon Spann was carefully holding, sitting on, or secreting the gun in a fashion so that the defendant was never in a position to go and get it, it remains unrefuted that the gun was in the front passenger compartment of the car, within arm's reach of the defendant. Surely, the jury was not compelled to conclude that the gun magically disappeared just because it disbelieved Spann's story of his own exclusive possession. The jury was therefore entitled to infer that the defendant would have had access to and control over it.[25]

---

"Q. Why didn't you tell anyone where you ditched the gun?

"A. Why?

"Q. I'm asking you why?

"A. Why would I do that?

"Q. Well, let's see, you just dropped a loaded firearm in a residential neighborhood. There could be children around. Don't you think it would be a good idea to let people know; hey, there's a loaded gun in a backyard somewhere.

"A. It would be a good idea. But, I mean, I'm a criminal, that's not what I was thinking at the time."

[25] In *Henderson* v. *United States*, 575 U.S. 622, 135 S. Ct. 1780, 191 L. Ed. 2d 874 (2015), the United States Supreme Court defined control of firearms under the federal felon-in-possession statute, 18 U.S.C. § 922 (g), as "whether [a] felon will have the ability to use or direct the use of his firearms"; id.,

State *v.* Rhodes

Thus, under this court's definition of "possession," and viewing the evidence in the light most favorable to sustaining the verdict, as we must, we conclude that the facts and inferences reasonably drawn from these facts sufficiently established the defendant's constructive possession of the firearm beyond a reasonable doubt. "[P]roof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the [jury], would have resulted in an acquittal." (Internal quotation marks omitted.) *State* v. *Taupier*, supra, 330 Conn. 187. The defendant, the prosecutor and the court each asked the jury to consider whether the defendant could "go and get" the gun. The jury concluded that she could. There is certainly "a reasonable view of the evidence" that supports this conclusion. (Internal quotation marks omitted.) *State* v. *Taupier*, supra, 187. Therefore, we affirm her conviction of criminal possession of a firearm.

630; and offered examples of when someone might have such control. Id., 630–31. The court stated that a felon could control guns that were actually possessed by a third party if the third party was not "independent of the felon's control"; id., 630; or would "allow the felon to exert any influence over [the guns'] use." Id. Here, the gun was in the actual possession of a third party, Spann. But, by allowing the defendant to drive while Spann had the gun, Spann was not "himself independent of [the defendant's] control" and did not prevent her from "exert[ing] any influence over [the gun's] use." Id.

On a record similar to this case, the United States Supreme Court viewed constructive possession consistently with our definition and application. In *Maryland* v. *Pringle*, 540 U.S. 366, 124 S. Ct. 795, 157 L. Ed. 2d 769 (2003), the issue was whether the police had probable cause to arrest the defendant for constructive possession of cocaine. Id., 370. The defendant, sitting in the front passenger seat of a car, was one of three occupants of a car the police stopped for speeding at about 3 a.m. Id., 368. Upon a search, the police found $763 in the glove compartment in front of the defendant and five bags of cocaine "behind the [backseat] armrest" next to another occupant; no occupant claimed possession of the cash or cocaine. Id. The court held: "We think it an entirely reasonable inference from these facts that any or all three of the occupants had knowledge of, and exercised dominion and control over, the cocaine." Id., 372. It added: "[A] car passenger . . . will

State *v.* Rhodes

C

Alternatively, the defendant argues that the nonexclusive possession doctrine does not apply in this case because Spann actually possessed the firearm. She maintains that actual possession is exclusive—that is, if one party has actual possession, another party may not also have constructive possession. She cites no authority for this proposition, however, basing this argument on the fact that no Connecticut court has yet applied the doctrine in a scenario involving a third party who actually possessed the firearm. She notes that Connecticut courts have applied the nonexclusive possession doctrine only in situations in which the firearm was unattended or there was evidence that the defendant had actually possessed it previously.

We decline to adopt the defendant's position. Even if we assume that Spann actually possessed the firearm for the entire afternoon—which the parties dispute, which the jury may very well have rejected, and which we do not decide—we find nothing in the doctrine itself, its policy, or its application in this or other jurisdictions to suggest that it is limited to cases involving constructive possessors only. As a general concept in our criminal law, "[p]ossession may be joint as where two or more persons have dominion and control over the articles involved and where such persons are all acting at the time pursuant to a common purpose." (Internal quotation marks omitted.) *State* v. *Gabriel*, 192 Conn. 405, 422–23, 473 A.2d 300 (1984). More specifically, this court has tacitly recognized on at least one occasion that "circumstances tending to buttress . . . an inference" of constructive possession; (internal quotation marks omitted) *State* v. *Williams*, supra, 258 Conn. 7; may arise regardless of who physically holds contraband at a given time, citing favorably to a case in which

often be engaged in a common enterprise with the driver, and have the same interest in concealing the fruits or the evidence of their wrongdoing." (Internal quotation marks omitted.) Id., 373.

State *v.* Rhodes

a defendant constructively possessed contraband when she drove a vehicle but a third party "sitting beside her, had the [contraband] in a gym bag . . . ." *United States* v. *Crockett*, 813 F.2d 1310, 1316 (4th Cir.) (cited by *State* v. *Delossantos*, supra, 211 Conn. 278), cert. denied, 484 U.S. 834, 108 S. Ct. 112, 98 L. Ed. 2d 71 (1987), and cert. denied sub nom. *Crews* v. *United States*, 484 U.S. 834, 108 S. Ct. 112, 98 L. Ed. 2d 71 (1987).

Outside of Connecticut, courts have applied the non-exclusive possession doctrine in scenarios similar to the present case—namely, to hold that a driver constructively possessed a firearm held by a passenger. E.g., *United States* v. *Richardson*, Docket No. 87-5006, 1987 WL 38924, *3 (4th Cir. November 2, 1987); *Logan* v. *United States*, supra, 489 A.2d 492. Other courts have gone further, holding that a defendant constructively possessed a firearm even though someone else held it *and* the defendant lacked *any* physical connection to it. See, e.g., *People* v. *Casanas*, 170 App. Div. 2d 257, 258, 566 N.Y.S.2d 7 (defendant constructively possessed firearm pointed at victim by codefendant during robbery because "[codefendant's] display of the weapon was part of the original robbery plan"), appeal denied, 77 N.Y.2d 959, 573 N.E.2d 581, 570 N.Y.S.2d 493 (1991); *State* v. *Jennings*, 335 S.C. 82, 87, 515 S.E.2d 107 (App. 1999) (defendant constructively possessed firearm used by friend during robbery because he "directed" and "instructed" friend to retrieve it, display it during robbery, and hide it after robbery). Accordingly, we reject the defendant's argument and affirm the conviction of criminal possession of a firearm.

II

The defendant's second claim on appeal is that there was insufficient evidence to support her conviction of having a weapon in a motor vehicle in violation of § 29-38 (a). A person who "knowingly has" a weapon in a vehicle without a permit is guilty of violating that stat-

State *v.* Rhodes

ute.[26] The defendant argues that, contrary to the legislature's intent, Connecticut courts have misconstrued the phrase "knowingly has" to criminalize mere knowledge of a firearm's presence in a vehicle "owned, operated or occupied by" the defendant. This construction has arisen from the Appellate Court's interpretation of the statute in *State* v. *Mebane*, 17 Conn. App. 243, 551 A.2d 1268, cert. denied, 210 Conn. 811, 556 A.2d 609, cert. denied, 492 U.S. 919, 109 S. Ct. 3245, 106 L. Ed. 2d 591 (1989). In *Mebane*, a defendant convicted under General Statutes (Rev. to 1985) § 29-38 argued that the jury should have been instructed that "knowingly has" meant "knowingly possesses . . . ." (Internal quotation marks omitted.) Id., 245. The court declined to "limit the scope of the statute" in this way, reasoning: "The statute is not concerned with possession or ownership of a weapon, but rather aims to penalize those who know that there is a weapon inside a motor vehicle." Id., 246.

The defendant now asks this court to overrule *Mebane* and to interpret "knowingly has" to mean "knowingly possesses." She thereby argues that her conviction must be reversed for insufficient evidence, on the basis of her mere knowledge of the firearm's presence in the Impala. Relying on the same grounds, she alternatively raises claims of instructional error and plain error; see Practice Book § 60-5; and asks this court to exercise

---

[26] General Statutes (Rev. to 2013) § 29-38 (a) provides in relevant part: "Any person who knowingly has, in any vehicle owned, operated or occupied by such person, any weapon, any pistol or revolver for which a proper permit has not been issued as provided in section 29-28 or any machine gun which has not been registered as required by section 53-202, shall be fined not more than one thousand dollars or imprisoned not more than five years or both, and the presence of any such weapon, pistol or revolver, or machine gun in any vehicle shall be prima facie evidence of a violation of this section by the owner, operator and each occupant thereof. . . ."

The defendant claims that there was insufficient evidence only as to the "knowingly has" element. She does not argue that there was insufficient evidence to establish that a proper permit had not been issued. The jury heard uncontested evidence that neither Spann nor the defendant had a permit to carry a firearm.

State *v.* Rhodes

its supervisory authority over the administration of justice to reverse her conviction.

Even if we were to assume, without deciding, that "knowingly has" means "knowingly possesses," constructive possession of a firearm would support a conviction even under the defendant's proposed reading of the statute. As set forth in part I of this opinion, possession may be actual or constructive, with constructive possession requiring knowledge and control of the object. Because knowledge is a necessary element of constructive possession, a person who constructively possesses an object also knowingly possesses it. Thus, in light of our conclusion that there was sufficient evidence that the defendant constructively possessed a firearm in connection with her conviction under § 53a-217 (a), we reach the same conclusion to support her conviction under § 29-38 (a).

Similarly, the jury's finding that the defendant constructively possessed a firearm under § 53a-217 (a) renders any potential instructional error harmless. Nor do we find plain error in the proper application of the law existing at the time of trial, which was the construction announced in *Mebane*. See *State* v. *Turner*, 334 Conn. 660, 684, 224 A.3d 129 (2020) (it is axiomatic that proper application of law existing at time of trial cannot constitute reversible error under plain error doctrine); *State* v. *Diaz*, 302 Conn. 93, 104 n.8, 25 A.3d 594 (2011) (same). Finally, recognizing that the exercise of our supervisory authority over the administration of justice is generally reserved for the adoption of procedural rules, we decline to exercise it to resolve this issue of statutory construction and evidentiary sufficiency. See, e.g., *In re Yasiel R.*, 317 Conn. 773, 790– 91, 120 A.3d 1188 (2015) (adopting procedural safeguard requiring trial courts to canvass parents who do not consent to termination of their parental rights prior to start of termination trial to ensure fairness). Therefore, we affirm the conviction without reaching the merits of the defendant's argument.

The judgment is affirmed.

State *v.* Rhodes

In this opinion MULLINS, VERTEFEUILLE and PRES-
COTT, Js., concurred.

MULLINS, J., concurring. I agree with and join the
majority opinion. I write separately to emphasize that
the question of whether the state presented sufficient
evidence that the defendant, Amelia Rhodes, construc-
tively possessed the firearm in the vehicle, in violation
of General Statutes (Rev. to 2013) § 53a-217 (a), is a
close one and to comment on the use of flight evidence
in this case.

In particular, the majority and the state highlight the
fact that the defendant drove the vehicle 1.2 miles, while
being chased by the police, in an effort to evade arrest
as evidence of her constructive possession of a firearm,
which supports her conviction of criminal possession
of a firearm.[1] For the reasons set forth in the majority
opinion, I ultimately agree that a rational fact finder
could have concluded from this evidence that a reason-

[1] After Lamar Spann, the armed passenger in the vehicle driven by the
defendant, committed the shooting and got back into the vehicle with the
gun, the defendant drove the vehicle onto the curb to avoid the officers'
vehicle, which they had attempted to use to block her escape. She then
continued to flee at a high rate of speed with the officers in pursuit, narrowly
avoiding pedestrians and speeding past stop signs without stopping. It has
been established that, "[a]lthough mere proximity to a gun is insufficient to
establish constructive possession, evidence of some other factor—including
connection with a gun, proof of motive, a gesture implying control, *evasive
conduct*, or a statement indicating involvement in an enterprise—coupled
with proximity may suffice." (Emphasis added; internal quotation marks
omitted.) *United States* v. *Alexander*, 331 F.3d 116, 127 (D.C. Cir. 2003). A
driver of a vehicle who evades the police for the purpose of assisting a
passenger to dispose of a firearm properly may be found to have construc-
tively possessed that firearm. See *United States* v. *Witcher*, 753 Fed. Appx.
159, 161 (4th Cir. 2018); *State* v. *Bowens*, 118 Conn. App. 112, 123–24, 982
A.2d 1089 (2009), cert. denied, 295 Conn. 902, 988 A.2d 878 (2010); *McDaniels*
v. *United States*, 718 A.2d 530, 531–32 (D.C. 1998); *Logan* v. *United States*,
489 A.2d 485, 491–92 (D.C. 1985); cf. *United States* v. *Chambers*, 918 F.2d
1455, 1458 (9th Cir. 1990) ("[c]onduct by the driver of a vehicle that appears
intended to aid a passenger in disposing of the drug is probative of joint
possession of the drug").

able explanation for the defendant's decision to flee was her intention to keep the firearm away from the police, thereby establishing her constructive possession of that firearm. See footnote 1 of this opinion. Nonetheless, the circumstances surrounding the use of flight evidence in this case give me pause.

Lamar Spann had just committed a shooting in broad daylight and in full view of the police. He then reentered the vehicle while armed, and the police officers, who had just witnessed Spann commit the shooting, were sharply focused on the vehicle and its occupants. Under these circumstances, it is not difficult to understand why someone in the defendant's position might have been reluctant to immediately surrender to the police. The defendant undoubtedly was well aware that the officers could have perceived her as armed and dangerous and, therefore, could have used deadly force against her. Indeed, the police have used deadly force on unarmed suspects for far less. Beyond that, Spann was sitting right next to her with a gun, telling her to "drive, go." Given these facts, it is entirely plausible that the defendant resorted to flight out of fear that surrendering would have placed her personal safety at risk—either at the hands of the police pursuing an armed suspect or the armed suspect sitting next to her.

Nevertheless, in reviewing the sufficiency of the evidence, "we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [jury's] verdict of guilty." (Internal quotation marks omitted.) *State* v. *Taupier*, 330 Conn. 149, 187, 193 A.3d 1 (2018), cert. denied, U.S. , 139 S. Ct. 1188, 203 L. Ed. 2d 202 (2019). Applying this standard, this court cannot substitute its judgment for that of the jury about what significance to accord the defendant's evasive conduct. "[T]he fact that ambiguities or explanations [for the defendant's flight] may exist which tend to rebut

State *v.* Rhodes

an inference of guilt . . . simply constitutes a factor for the jury's consideration. . . . The probative value of evidence of flight depends upon all the facts and circumstances and is a question of fact for the jury.'' (Citation omitted; internal quotation marks omitted.) *State* v. *Wright*, 198 Conn. 273, 281, 502 A.2d 911 (1986). Indeed, regardless of the alternative theories proposed by the defendant, "the critical point is that the jury could have drawn different inferences from [the] evidence, and our mandate is to affirm when the jury's choice was a rational one—which it was here.'' *United States* v. *Arnold*, 486 F.3d 177, 182 (6th Cir. 2007), cert. denied, 552 U.S. 1103, 128 S. Ct. 871, 169 L. Ed. 2d 736 (2008).

Thus, the presence of alternative explanations for the defendant's flight does not render the evidence insufficient. Ultimately, the motivation for the defendant's flight was a question for the jury. Because the jury rationally could have concluded that disposing of the firearm was a reasonable explanation for the defendant's decision to flee from the police, I am compelled to conclude that there was sufficient evidence of constructive possession of a firearm in the present case.

Accordingly, I respectfully concur.

ECKER, J., with whom PALMER and McDONALD, Js., join, concurring in part and dissenting in part. I respectfully dissent from part I of the majority opinion because I do not believe that the evidence was sufficient to support the conviction of the defendant, Amelia Rhodes, of criminal possession of a firearm in violation of General Statutes (Rev. to 2013) § 53a-217 (a). I concur in part II of the majority opinion, in which the majority upholds the defendant's conviction of having a weapon in a motor vehicle in violation of General Statutes (Rev. to 2013) § 29-38 (a), but on different grounds than those relied on by the majority.

State *v.* Rhodes

## I

## A

In no conventional sense of the word did the defendant "possess" the firearm carried by her friend and passenger, Lamar Spann, on the afternoon of August 17, 2013.[1] She did not own it and had no legally cognizable possessory interest in it. She never was in actual physical possession of the firearm; she never physically held it or touched it, even for a moment, and the state never claimed otherwise. Likewise, the jury was presented with no evidence that the defendant herself at any time had the practical ability to obtain actual physical possession of the firearm. Nor was there any evidence that she occupied a position of authority over Spann that would have allowed her to direct him to use the firearm at her command. No evidence was presented that Spann previously had permitted the defendant to use his firearm or would have done so on this occasion upon request. Finally, there was not a shred of evidence at trial that the defendant intended to exercise control over the firearm itself, as opposed to the car in which it was located. Reversal of the defendant's conviction of criminal possession of a firearm is required under these circumstances because these significant evidentiary gaps cannot be filled in without resort to impermissible speculation and surmise.

As in many appeals challenging the sufficiency of the evidence supporting a criminal conviction, resolution of the defendant's claim requires us to determine the point at which permissible inference becomes impermissible speculation. I agree with the majority that where to draw this line in any particular case ultimately is a

---

[1] The record reflects that Spann was convicted of various crimes arising out of the August 17, 2013 shooting, including criminal possession of the firearm in question. The primary issue on appeal is whether the evidence is legally sufficient to establish beyond a reasonable doubt that the defendant jointly possessed Spann's firearm by operating the vehicle in which Spann was a passenger while he was in actual physical possession of the firearm.

State *v.* Rhodes

matter of judgment. I further agree that a reviewing court undertaking the task of line drawing must exercise maximum restraint and exhibit great deference to the jury's verdict due to the jury's vital, constitutional role in our system of justice; the majority rightly reminds us that we do not sit as a seventh juror. See *State* v. *Ford*, 230 Conn. 686, 693, 646 A.2d 147 (1994). But there is more to the picture, because the same constitution also imposes limitations on the jury's power to convict an accused in a criminal case—there are other constitutional values at stake in addition to the jury right. In particular, a reviewing court is obligated to ensure that a criminal conviction is supported by evidence sufficient to find a defendant guilty of the crime charged beyond a reasonable doubt. See, e.g., *In re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970); see also J. Newman, "Beyond 'Reasonable Doubt,' " 68 N.Y.U. L. Rev. 979, 980 (1993) (encouraging appellate courts "to take the [reasonable doubt] standard seriously as a rule of law against which the validity of convictions is to be judged"). In my judgment, the evidence in the present case fails to meet that high standard.

The rules governing appellate review in this context are well established. "The two part test this court applies in reviewing the sufficiency of the evidence supporting a criminal conviction is well established. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the jury reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt." (Footnote omitted; internal quotation marks omitted.) *State* v. *Lewis*, 303 Conn. 760, 767, 36 A.3d 670 (2012). "In evaluating evidence that could yield contrary inferences, the trier of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The trier [of fact] may draw whatever infer-

State *v.* Rhodes

ences from the evidence or facts established by the evidence it deems to be reasonable and logical.'' (Internal quotation marks omitted.) *State* v. *Drupals*, 306 Conn. 149, 158, 49 A.3d 962 (2012). However, ''[b]ecause [t]he only kind of an inference recognized by the law is a reasonable one . . . any such inference cannot be based on possibilities, surmise or conjecture. . . . It is axiomatic, therefore, that [a]ny [inference] drawn must be rational and founded upon the evidence. . . . [T]he line between permissible inference and impermissible speculation is not always easy to discern. When we infer, we derive a conclusion from proven facts because such considerations as experience, or history, or science have demonstrated that there is a likely correlation between those facts and the conclusion. If that correlation is sufficiently compelling, the inference is reasonable. But if the correlation between the facts and the conclusion is slight, or if a different conclusion is more closely correlated with the facts than the chosen conclusion, the inference is less reasonable. At some point, the link between the facts and the conclusion becomes so tenuous that we call it speculation.'' (Internal quotation marks omitted.) *State* v. *Lewis*, supra, 768–69.

No objective formula or uniform template tells us how to distinguish reasonable inference from impermissible speculation. It should be clear, however, that our appellate review may not rely on speculative guesswork any more than may the jury's verdict. This is not an exercise in appellate storytelling. Yet, I fear that the majority's effort to conjure a basis for the jury's verdict at times propels the majority into the realm of speculation, as when the majority pictures the jurors rolling their eyes or splitting their sides in laughter. See footnote 22 of the majority opinion and accompanying text. There are limitations on the inferences that may be drawn from the evidence. One such limitation is the requirement that an inference be reasonable, which

State *v.* Rhodes

means that it must be more than merely possible—it
must be *probable*. This court has explained that "[a]n
inference is not legally supportable . . . merely because
the scenario that it contemplates is remotely possible
under the facts. To permit such a standard would be
to sanction fact-finding predicated on mere conjecture
or guesswork. Proof by inference is sufficient, rather,
only if the evidence produces in the mind of the trier
[of fact] a *reasonable belief in the probability of the
existence* of the material fact." (Emphasis in original;
internal quotation marks omitted.) *State* v. *Reynolds*,
264 Conn. 1, 97, 836 A.2d 224 (2003), cert. denied, 541
U.S. 908, 124 S. Ct. 1614, 158 L. Ed. 2d 254 (2004); see
also *State* v. *Copas*, 252 Conn. 318, 339–40, 746 A.2d 761
(2000) (although "[p]roof of a material fact by inference
from circumstantial evidence need not be so conclusive
as to exclude every other hypothesis," it must be suffi-
cient to produce "in the mind of the trier [of fact] a
reasonable belief in the probability of the existence of
the material fact" (internal quotation marks omitted)).
Anything less is mere "speculation and conjecture,"
which is "insufficient to sustain the burden of proof
beyond a reasonable doubt . . . ." (Internal quotation
marks omitted.) *State* v. *Sivri*, 231 Conn. 115, 131–32,
646 A.2d 169 (1994).

The point is an important one because it operates to
prevent the dilution of a constitutional standard. The
constitution does not require that the subordinate facts
each be proven beyond a reasonable doubt, but it still
forbids criminal convictions to be based on guesswork;
a reviewing court will draw the line at verdicts resting
on merely *possible* factual scenarios as opposed to
*probable* ones. This key distinction explains why the
majority misses the point when it suggests that this
concurring and dissenting opinion reaches its conclu-
sions by substituting its own "alternative explanations"
and by preferring more "benign" and "innocent" inter-
pretations of the evidence than those offered by the

State *v.* Rhodes

majority. The alternatives are provided to demonstrate the speculative nature of the inferences posited by the majority. The analysis, in other words, is intended to demand that the critical inculpatory inferences necessary to reach a guilty verdict in this case were not conjectural on this factual record.

Although the majority correctly points out that "[w]e do not sit as the 'seventh juror' when we review the sufficiency of the evidence"; *State* v. *Ford*, supra, 230 Conn. 693; we also may not abdicate our constitutional responsibility to ensure that a criminal conviction is supported by sufficient evidence to find the defendant guilty beyond a reasonable doubt. Our sufficiency review "is not entirely toothless . . . for [w]e do not . . . fulfill our duty through rote incantation of [the principles governing a review of sufficiency of evidence] followed by summary affirmance." (Citation omitted; internal quotation marks omitted.) *United States* v. *Salamanca*, 990 F.2d 629, 638 (D.C. Cir.), cert. denied, 510 U.S. 928, 114 S. Ct. 337, 126 L. Ed. 2d 281 (1993). Although "[a] jury is entitled to draw a vast range of reasonable inferences from [the] evidence, [it] may not base a verdict on mere speculation"; (internal quotation marks omitted) id.; "and caution must be taken that the conviction not be obtained by piling inference on inference." (Internal quotation marks omitted.) *United States* v. *Jones*, 44 F.3d 860, 865 (10th Cir. 1995).

B

I now turn to the law of constructive possession.[2] Constructive possession is a "legal fiction . . . ." (Internal quotation marks omitted.) *United States* v. *Jones*, 872 F.3d 483, 489 (7th Cir. 2017), cert. denied, U.S. , 138 S. Ct. 936, 200 L. Ed. 2d 211 (2018), and cert. denied,

---

[2] It is undisputed that the defendant in this case never had actual physical possession of Spann's firearm. Indeed, the trial court granted the defendant's motion for a judgment of acquittal on the charge of carrying a pistol without a permit in violation of General Statutes § 29-35 (a) on the ground that there was no evidence that the defendant had "carried [the firearm] on . . . her person . . . ."

State *v.* Rhodes

U.S. , 138 S. Ct. 1023, 200 L. Ed. 2d 283 (2018); see id. (''[c]onstructive possession is a legal fiction whereby a person is deemed to possess [a gun] even when he does not actually have immediate, physical control of the [gun]'' (internal quotation marks omitted)); *State* v. *Williams*, 110 Conn. App. 778, 787, 956 A.2d 1176 (describing ''the legal fiction of constructive possession that can be inferred from the circumstances and can be the equivalent of actual possession''), cert. denied, 289 Conn. 957, 961 A.2d 424 (2008). The doctrine of constructive possession was devised to prevent individuals from evading culpability simply by divesting themselves of physical possession of, or title to, contraband while nonetheless maintaining dominion or control over the contraband in fact. See, e.g., *Henderson* v. *United States*, 575 U.S. 622, 627, 135 S. Ct. 1780, 191 L. Ed. 2d 874 (2015) (''[t]he idea of constructive possession is designed to preclude'' individuals from divesting themselves of physical custody and title by ''arranging a sham transfer that leaves [them] in effective control of [the contraband]''); *United States* v. *Bentvena*, 319 F.2d 916, 950 (2d Cir.) (''Quite frequently, the ringleaders or overlords of the narcotics business do not stultify themselves by possession when handlers can be so cheaply hired. Therefore, in an effort to bring a modicum of reality into the picture,'' the courts created the doctrine of constructive possession.), cert. denied sub nom. *Ormento* v. *United States*, 375 U.S. 940, 84 S. Ct. 345, 11 L. Ed. 2d 271 (1963). The doctrine ''allow[s] the law to reach beyond puppets to puppeteers.'' (Internal quotation marks omitted.) *Henderson* v. *United States*, supra, 627.

At a conceptual level, the need for the doctrine of constructive possession arises from an ambiguity in the operative word, ''possession.''[3] The ambiguity stems

---

[3] This court long ago observed that, ''[a]s to 'possession,' there is no word more ambiguous in its meaning.'' *Hancock* v. *Finch*, 126 Conn. 121, 122–23, 9 A.2d 811 (1939), citing *National Safe Deposit Co.* v. *Stead*, 232 U.S. 58,

State *v.* Rhodes

from the fact that "to possess" connotes a direct *physical* relationship between the possessor and the item at issue, at least when used in reference to tangible things; to possess a thing is to have and hold it. See, e.g., Webster's Third New International Dictionary (1961) p. 1770 (defining "possess" as, inter alia, "to have and hold as property").[4] It is this physical aspect of possession that created the need to develop a doctrine of "constructive" possession in the law, because the word must extend beyond a purely physical meaning to serve a useful role in structuring legal relations. Otherwise, "one could only possess what was under his hand." O. Holmes, The Common Law (1881) p. 236.

---

34 S. Ct. 209, 58 L. Ed. 504 (1914). *Hancock* is a civil case, but courts and commentators alike often have made the same point in connection with the law of criminal possession. One scholarly article begins with this oft-quoted observation: "The word 'possession,' though frequently used in both ordinary speech and at law, remains one of the most elusive and ambiguous of legal constructs." C. Whitebread & R. Stevens, "Constructive Possession in Narcotics Cases: To Have and Have Not," 58 Va. L. Rev. 751, 751 (1972); see also *Henderson* v. *United States*, supra, 575 U.S. 625–30 (addressing definitional difficulty in case requiring court to decide whether person lawfully can transfer gun to third party without thereby illegally possessing it); *State* v. *Schmidt*, 110 N.J. 258, 266–70, 540 A.2d 1256 (1988) (discussing definitional difficulty and wide spectrum of views); *State* v. *Barber*, 135 N.M. 621, 626, 92 P.3d 633 (2004) ("The legal definition of possession is not necessarily rooted in common discourse. . . . Courts differ on whether the legal concept of possession is a common term with no artful meaning or the most vague of all vague terms." (Citation omitted; internal quotation marks omitted.)); 1 W. LaFave, Substantive Criminal Law (2d Ed. 2003) § 6.1 (e), p. 432 ("[t]he word 'possession' is often used in the criminal law without definition, which perhaps reflects only the fact that it is 'a common term used in everyday conversation that has not acquired any artful meaning' "). "Of this chameleon-hued word," says legal lexicographer Bryan A. Garner, "a legal philosopher pessimistically states: The search for [its] proper meaning . . . is likely to be a fruitless one." (Internal quotation marks omitted.) B. Garner, Dictionary of Legal Usage (3d Ed. 2011) p. 688, quoting G. Paton, A Textbook of Jurisprudence (4th Ed. 1972) p. 553.

[4] In light of Spann's testimony that he was sitting on the firearm during most of the relevant time, it is noteworthy that the origin of the word "possession" traces back to the Latin words for "able to sit upon." See Webster's Third New International Dictionary, supra, p. 1770 ("fr[om] *potis* able, possible [and] *sedre* to sit"). No doubt Spann possessed the gun.

Jurists have long recognized that the modifier "constructive" must not be allowed to overwhelm the inherent limitation contained in the operative word, "possession." Judge Edward A. Tamm wrote the following cautionary words on this subject almost fifty years ago: "The rhetorical legerdemain compounded in this area of the law invokes abstractions which appear more designed to achieve a particular result in an individual case than to stabilize and formalize a workable index of objective standards. The more cases one reads on constructive possession the deeper is he plunged into a thicket of subjectivity. Successive cases enumerate a continuing [reinterpretation] which can only be described as judicial whimsy." *United States* v. *Holland*, 445 F.2d 701, 703 (D.C. Cir. 1971) (Tamm, J., concurring); cf. *Berkey* v. *Third Avenue Railway Co.*, 244 N.Y. 84, 94, 155 N.E. 58 (1926) (Cardozo, J.) ("[m]etaphors in law are to be narrowly watched, for starting as devices to liberate thought, they end often by enslaving it"). The majority's treatment of constructive possession in the present case, in my view, fails to adequately police the outer boundaries of the doctrine and, in doing so, fails to ensure that criminal laws of uncertain scope are interpreted and applied narrowly rather than expansively. See, e.g., *State* v. *LaFleur*, 307 Conn. 115, 126, 51 A.3d 1048 (2012) ("[w]hen the statute being construed is a criminal statute, it must be construed strictly against the state and in favor of the accused" (internal quotation marks omitted)).

Because the very concept of constructive possession is an abstraction, virtually every jurisdiction, including Connecticut, has found it necessary to develop doctrinal aids to help facilitate its application to the facts of any particular case. We begin with our penal code, which provides that " '[p]ossess' means to have physical possession *or otherwise to exercise dominion or control over tangible property* . . . ." (Emphasis added.) General Statutes § 53a-3 (2). Courts have added a judi-

State *v.* Rhodes

cial gloss to the statutory "dominion or control" language because those words,[5] like the word possession itself, are too broad to illuminate the nature and degree of control that equates to actual physical possession. Some of these judicial refinements are more useful than others. I see no value at all in borrowing, as the majority does, from the formulation articulated in 1978 by the United States Court of Appeals for the District Columbia, which asks if the evidence has the "capability plausibly to suggest the likelihood that in some discernable fashion the accused had a substantial voice vis-à-vis the [contraband]." *United States* v. *Staten*, 581 F.2d 878, 884 (D.C. Cir. 1978). It is likewise unhelpful, in my view, to ask whether the defendant has the "power or authority to guide or manage" the contraband. (Internal quotation marks omitted.) *State* v. *Hill*, 201 Conn. 505, 516, 523 A.2d 1252 (1986). These standards are fine as generic statements describing the doctrine, but they add no practical value because they do little more than substitute one vague term for another and because they fail to provide useful guidance for determining the nature and degree of control, dominion, power or authority that will be considered sufficient to equate to actual physical possession.

Far greater assistance is provided by the simple principle that was invoked by the prosecutor, the defense, and the trial court in the present case to define the essence of constructive possession. The majority describes the consensus in this way: "In addressing the jury, the prosecutor, defense counsel, and the trial court all referred to [constructive possession] as the practical ability of the defendant to 'go and get' the gun [if she wished to do so], or the practical ability to obtain actual physical possession of it." Constructive possession, in

---

[5] As the trial court properly instructed the jury, the terms "dominion" and "control" are "synonymous, meaning they are different terms used to describe the same thing."

State *v.* Rhodes

other words, means that the defendant had both the intention and the practical ability to reduce the contraband to her actual physical possession if she so desired.[6] See, e.g., *Henderson* v. *United States*, supra, 575 U.S. 630 (defining constructive possession under federal felon in possession statute, 18 U.S.C. § 922 (g), as "hav[-ing] the ability to use or direct the use of [the] firearms"); *United States* v. *Chauncey*, 420 F.3d 864, 873 (8th Cir. 2005) ("[t]he linchpin of the ownership, dominion, or control required for constructive possession is not direct, physical control, but the ability to reduce an object to actual possession" (internal quotation marks omitted)), cert. denied, 547 U.S. 1009, 126 S. Ct. 1480, 164 L. Ed. 2d 258 (2006); *United States* v. *Jenkins*, 90 F.3d 814, 822 (3d Cir. 1996) (Cowen, J., dissenting) ("the terms dominion and control are to be interpreted as the ability to reduce an object to actual possession" (internal quotation marks omitted)); *United States* v. *Caballero*, 712 F.2d 126, 129 (5th Cir. 1983) ("[i]n essence, constructive possession is the ability to reduce an object to actual possession" (internal quotation marks omitted)); *State* v. *Richards*, 286 S.W.3d 873, 884–85 (Tenn. 2009) (Koch, J., dissenting) (defining constructive possession as "the ability to reduce an object to actual possession" (internal quotation marks omitted)); *State* v. *Jones*, 146 Wn. 2d 328, 333, 45 P.3d 1062 (2002) ("A defendant has actual possession when he or she has physical custody of the item and constructive possession if he or she has dominion and control over the item. . . . Dominion and control means that the object

_____

[6] It is not necessary that the defendant manifest the requisite intention by *exercising* her practical ability to obtain actual physical possession of the contraband, only that she could do so if she so desired. As this court explained in *State* v. *Hill*, supra, 201 Conn. 516, "[t]he essence of exercising control is not the manifestation of an act of control but instead it is the act of being in a position of control coupled with the requisite mental intent. In our criminal statutes involving possession, this control must be exercised intentionally and with knowledge of the character of the controlled object."

State *v.* Rhodes

may be reduced to actual possession immediately.'' (Citation omitted.)); cf. *Bulkley* v. *Dolbeare*, 7 Conn. 232, 234–35 (1828) (to have constructive possession of property, ''a plaintiff must have such a right as to be entitled to reduce the goods to actual possession, when he pleases'' (internal quotation marks omitted)).

Our constructive possession jurisprudence provides additional guidance when, as in the present case, the state's case is not predicated on a claim of exclusive possession of the contraband but, instead, on the theory that the defendant and another person were in joint possession of the contraband. See footnote 1 of this opinion. ''[When] the defendant is not in exclusive possession of the premises where the [contraband is] found, it may not be inferred that [the defendant] knew of the presence of the [contraband] and had control of [it], unless there are other incriminating statements or circumstances tending to buttress such an inference.'' (Internal quotation marks omitted.) *State* v. *Johnson*, 316 Conn. 45, 58, 111 A.3d 436 (2015). ''Accordingly, [t]o mitigate the possibility that innocent persons might be prosecuted for possessory offenses . . . it is essential that the state's evidence include more than just a temporal and spatial nexus between the defendant and the contraband.'' (Internal quotation marks omitted.) *State* v. *Bowens*, 118 Conn. App. 112, 121, 982 A.2d 1089 (2009), cert. denied, 295 Conn. 902, 988 A.2d 878 (2010). ''In such cases, the government is required to present direct or circumstantial evidence to show some connection or nexus individually linking the defendant to the contraband.'' (Internal quotation marks omitted.) *State* v. *Johnson*, supra, 62. Furthermore, there must be ''a compelling correlation between the actions of a defendant prior to arrest and the conclusion of dominion and control'' in order for a reviewing court to ''find that the jury's conclusion was a reasonable inference.'' *State* v. *Billie*, 123 Conn. App. 690, 701, 2 A.3d 1034 (2010).

State *v.* Rhodes

C

The remaining task is to apply the foregoing legal
principles to determine whether the evidence of con-
structive possession was sufficient to support the jury's
verdict. I agree with the majority that, after the shooting,
the evidence plainly was sufficient to support a reason-
able inference that the defendant knew that Spann was
in actual physical possession of a firearm. As I have
discussed, however, driving a car with the knowledge
that a passenger is in actual physical possession of a
firearm is not enough to support an inference of con-
structive possession; the state must adduce evidence
"*individually linking*" the defendant to the passenger's
firearm. (Emphasis added; internal quotation marks
omitted.) *State* v. *Johnson*, supra, 316 Conn. 62. The
majority believes that "four circumstances" provided
the crucial link between the defendant and Spann's
firearm: (1) her control of the car; (2) her flight from
the police; (3) her relationship with Spann; and (4) her
physical access to Spann's firearm. I address each of
these circumstances in turn and conclude, for the rea-
sons that follow, that they are insufficient, both individ-
ually and collectively, to sustain the defendant's con-
viction.

First, as the majority acknowledges, when the defen-
dant is not in exclusive possession of the residence or
vehicle in which the contraband is found,[7] mere proxim-

___

[7] The majority's reliance on *State* v. *Delossantos*, 211 Conn. 258, 277–78,
559 A.2d 164, cert. denied, 493 U.S. 866, 110 S. Ct. 188, 107 L. Ed. 2d
142 (1989), to support the proposition that "[o]ne who owns or exercises
dominion or control over a motor vehicle in which [contraband] is concealed
may be deemed to possess the contraband" is misplaced. In *Delossantos*,
the defendant was the "lone occupant of the automobile"; id., 261; and,
when a driver is in *exclusive* possession of an automobile, it is reasonable
to infer that he or she had both the power and intent to exercise dominion or
control over the contents of that automobile. As we explained in *Delossantos*,
however, "[w]here the defendant is *not* in exclusive possession of the prem-
ises where the [contraband is] found, it may *not* be inferred that [the defen-
dant] knew of the presence of the [contraband] and had control of [it],
*unless there are other incriminating statements or circumstances tending*

State *v.* Rhodes

ity to the contraband and knowledge of its presence are
"not enough to establish constructive possession." (Inter-
nal quotation marks omitted.) Id. "The driver of a vehicle
can transport passengers and their possessions without"
being in constructive possession of "every object in
the vehicle." *Flores-Abarca* v. *Barr*, 937 F.3d 473, 483
(5th Cir. 2019); see also *State* v. *Foster*, 128 Haw. 18,
30, 282 P.3d 560 (2012) (holding that evidence was insuf-
ficient to support defendant driver's conviction of being
felon in possession of firearm, even though he knew his
passenger was in actual physical possession of firearm,
because control over car "is not by itself enough to estab-
lish constructive possession of contraband found there"
(internal quotation marks omitted)). The United States
Court of Appeals for the Fifth Circuit has aptly observed
that dominion and control "over the vehicle . . . alone
cannot establish constructive possession of a weapon
found in the vehicle, particularly in the face of evidence
that strongly suggests that somebody else exercised
dominion and control over the weapon. . . . Although
knowledge of a firearm's presence may be *evidence* of
possession, knowing transportation does not conclu-
sively establish constructive possession as a matter of
law." (Citations omitted; emphasis in original; internal
quotation marks omitted.) *Flores-Abarca* v. *Barr*, supra,
483.

The majority states that there are "additional circum-
stances under which the defendant operated the vehi-
cle" in the present case that "buttressed an inference
of an intent to control the gun contained within the
vehicle . . . ." Footnote 13 of the majority opinion.
According to the majority, these additional circum-

*to buttress such an inference.*" (Emphasis added; internal quotation marks
omitted.) Id., 277. Thus, in the absence of additional evidence—which, for
the reasons explained in the body of this opinion, I believe is lacking in
this case—the defendant's knowledge of Spann's firearm and her control
of the car do not support a reasonable inference that she constructively
possessed Spann's firearm.

State *v.* Rhodes

stances include "that she drove the vehicle to the place where Spann discharged the gun'' and that she "waited for him to get back in the vehicle with the gun after the shooting, notwithstanding that she was a felon . . . .''[8] Id. The flaw in the majority's reasoning is that these particular facts have no probative value, unless one assumes that the defendant was Spann's knowing accomplice to a premeditated crime using Spann's firearm, which, as I discuss later in this opinion, is a theory that the jury affirmatively *rejected* by acquitting the defendant of the crime of attempt to commit assault in the first degree in violation of General Statutes §§ 53a-59 (a) (1) and 53a-49 (a) (2). There is no evidence that the defendant even knew about Spann's firearm, much less that he intended to use it, until the moment the shooting occurred. By all accounts, Spann was back in the vehicle within a matter of seconds thereafter. In my view, it is speculative and, therefore, unreasonable to conclude that the defendant's operation of a motor vehicle under these factual circumstances was indicative of an intent to exercise control over *Spann's firearm*, as opposed to the *vehicle* in which Spann carried his firearm.

Simply put, the state failed to adduce any evidence linking the defendant to either Spann's firearm or any related criminality at any time prior to the shooting. There was no evidence, for example, that the defendant was involved in Spann's drug dealing enterprise. There were no drugs, drug packaging materials or significant amounts of cash found on the defendant's person or recovered from the interior of the vehicle. The state offered no evidence of any historical connection between the defendant and Spann's drug dealing. Likewise, there

_____

[8] The majority also observes that the defendant "drove the vehicle 1.2 miles while being chased by the police in an effort to evade arrest for her participation in the shooting . . . .'' Footnote 13 of the majority opinion. I address this point later in this opinion in connection with the majority's discussion regarding the significance of the defendant's "flight'' immediately following the shooting incident.

State *v.* Rhodes

was no forensic evidence, such as fingerprint, DNA or ballistic evidence, individually linking the defendant to Spann's firearm, there was not any direct or circumstantial evidence indicating that the defendant had handled Spann's firearm that day or on any prior occasion, and there was no evidence that the defendant requested access to the firearm, reached out for the firearm, or leaned across the front seat in an effort to acquire the firearm from Spann. Nor was there any evidence indicating that Spann would have been willing to surrender physical possession of the firearm to the defendant upon request. The state, moreover, was unable to fill in these gaps using any inculpatory statements made by Spann or the defendant to the police regarding the defendant's possession of the firearm or participation in the shooting. This case, in other words, is devoid of the type of evidence that the courts of this state have found sufficient to link a defendant individually to contraband in nonexclusive possession cases. Cf. *State* v. *Winfrey*, 302 Conn. 195, 210–13, 24 A.3d 1218 (2011) (evidence was sufficient to establish that defendant driver knew of and exercised dominion and control over drugs found in center console of vehicle registered to defendant's wife when, following stop for motor vehicle violation, defendant was seen dropping and swallowing package of suspected heroin to escape criminal liability and had more than $550 in cash and rolling papers on his person at time of arrest); *State* v. *Butler*, 296 Conn. 62, 79, 993 A.2d 970 (2010) (evidence was sufficient to support inference that defendant driver possessed narcotics found in console of vehicle because defendant's "manipulation of the console within which the narcotics were discovered, presumably to conceal that contraband, buttressed the jury's inference that the defendant knew about the narcotics and had control over them," and "there was significant evidence from which it was rea-

State *v.* Rhodes

sonable for the jury to infer that the defendant was a narcotics dealer''); *State* v. *Bowens*, supra, 118 Conn. App. 123–26 (evidence was sufficient to support defendant driver's criminal possession of firearm conviction because, in addition to fleeing from police, heroin and marijuana were found in car, defendant was in possession of $1293 in cash, shell casing found in car matched bullet from firearm recovered by police, and defendant had personal motive to carry firearm because he had been involved in shooting earlier that day); *State* v. *Sanchez*, 75 Conn. App. 223, 237–42, 815 A.2d 242 (evidence was sufficient to support inference that defendant driver had constructive possession of drugs because defendant was seen smoking marijuana filled cigar, officers smelled marijuana, defendant fled police while discarding cigar, and narcotics were found in plain view in open ashtray), cert. denied, 263 Conn. 914, 821 A.2d 769 (2003); *State* v. *Grant*, 51 Conn. App. 824, 829, 725 A.2d 367 (evidence was sufficient to support inference of constructive possession because ''[t]wo experienced detectives familiar with the defendant identified him as the driver of the car and observed him receive money from a female and give her an item from a paper bag in a high drug traffic area,'' defendant ''fled in his car when [a police officer] ordered him to shut off his engine,'' and defendant was observed ''throw[ing] the paper bag from his car''), cert. denied, 248 Conn. 916, 734 A.2d 568 (1999). But cf. *State* v. *Cruz*, 28 Conn. App. 575, 580–81, 611 A.2d 457 (1992) (reversing defendant driver's conviction for possession of marijuana and possession of drug paraphernalia because defendant did not own vehicle in which marijuana seed and rolling papers were found, defendant's statement about past marijuana use was ''minimally probative of the issue of dominion and control of the seed,'' and ''[t]he evidence . . . equally supported a conclusion that the defendant was unaware

State *v.* Rhodes

of the presence of either the seed or the rolling papers and did not exercise dominion and control over them'').[9]

This brings us to what I consider the heart of the case. The majority attributes great significance to the fact that the defendant ''drove the vehicle 1.2 miles while being chased by the police in an effort to evade arrest'' and considers this evasive conduct to be the second circumstance supporting the inference that the defendant was in constructive possession of Spann's firearm. Footnote 13 of the majority opinion. More specifically, the majority concludes that the defendant's flight from the police (1) supported a reasonable inference that she drove the car with an intent to control the firearm itself in order to prevent the police from seizing the firearm after the shooting, and (2) revealed the defendant's consciousness of guilt with respect to the possession charge. I disagree. The issue is *not* whether the defendant's flight was criminal in nature or whether it may have been punishable under some other provision of the penal law, such as having a weapon in a motor vehicle in violation of § 29-38 (a). See part II of this opinion. More narrowly still, the issue is *not* whether the defendant's flight is evidence connecting her to the shooting committed by Spann or whether it reflects a guilty mind with regard to the shooting. Rather, the one issue that matters on appeal is whether the defendant's conduct supports a reasonable inference that she likely was fleeing the scene—not merely to avoid capture, and not merely to avoid her friend being arrested— *with the intention to exercise dominion or control over Spann's firearm*. On this record, I consider such a conclusion wholly speculative.

[9] The difference between the majority opinion and this concurring and dissenting opinion can be summarized as the difference between the view that such additional evidence ''might have helped to establish constructive possession,'' as the majority acknowledges, and my view that the conviction cannot be sustained in the absence of at least some additional evidence of this nature.

State *v.* Rhodes

"[T]he probative value of evidence of flight is, in large part, dependent upon facts pointing to the motive [that] prompted it.'' *State* v. *Piskorski*, 177 Conn. 677, 723, 419 A.2d 866, cert. denied, 444 U.S. 935, 100 S. Ct. 283, 62 L. Ed. 2d 194 (1979). "We repeatedly have recognized that evidence of flight from the scene of a crime inherently is ambiguous.'' *State* v. *Luster*, 279 Conn. 414, 423, 902 A.2d 636 (2006). These observations apply fully to our consideration of the defendant's flight as evidence of her specific intention to control Spann's firearm. The defendant's flight under the circumstances of this case might have been prompted by various possible motivations or some combination thereof. Perhaps she simply was trying to help her friend escape apprehension. Or maybe she fled the scene out of pure undifferentiated fear, resulting from nothing more complicated than the obvious and overwhelming fact that she suddenly found herself in the middle of a highly volatile situation involving criminal activity perpetrated by her friend sitting in the passenger seat. In other words, the defendant could have been motivated by a "fight or flight'' instinct, which prompted her to flee rather than to remain at the scene. The defendant might have been motivated by a sense of self-preservation, upon realizing that her very presence in the car, under the circumstances, created a high risk that she herself would be implicated in Spann's criminal activity. In addition, we have come to recognize that social factors unrelated to actual guilt or innocence often will also figure into a person's decision to flee due to that person's concerns about the perceptions that the police may formulate as a result of demographic considerations. See *State* v. *Edmonds*, 323 Conn. 34, 74, 145 A.3d 861 (2016) ("[a]mong some citizens, particularly minorities and those residing in high crime areas, there is also the possibility that the fleeing person is entirely innocent but, with or without justification, believes that contact with the police can itself be dangerous, apart from any criminal activity

State *v.* Rhodes

associated with the officer's sudden presence'' (internal quotation marks omitted)). Of course, I cannot say which of these (or any other) possibilities describe the actual motivations behind the defendant's flight because I have no way to know. But this is precisely the point. A jury's preference for one psychological explanation over another, like my own, could only be based on guesswork under the present factual circumstances.

If only to demonstrate that we are left merely to speculate among possibilities, I note my own view that, of the various possible inferences that have been proposed to explain why the defendant fled the scene and sought to evade the police, I consider the least plausible to be the idea that her flight, more likely than not, was motivated by a conscious desire to exercise control over Spann's firearm, as distinct from the car in which Spann's firearm happened to be located. Without more— and there is not more on this record—the supposition strikes me as particularly far-fetched. Again, there is no evidence that the defendant exhibited any particularized interest in Spann's firearm or that she, by words or action, demonstrated any "individualized" connection to the firearm. She did not, for example, reach out for the firearm, lean across the front seat and across (or under) Spann's body to grab the firearm, or engage in any other conduct indicating any particularized concern regarding the firearm. Cf. *State* v. *Bowens*, supra, 118 Conn. App. 123–24 (noting, among other indicia of intent, that "the defendant fled from the police and only the revolver was discarded, leaving the heroin and marijuana in the car," which "suggest[ed] that the motivation in fleeing was to jettison the revolver"); *McDaniels* v. *United States*, 718 A.2d 530, 531–32 (D.C. 1998) (upholding defendant's conviction because jury reason ably could have inferred from defendant's flight from police and attempted concealment of weapon that he was part of "an ongoing criminal operation" involving

State *v.* Rhodes

possession of weapon); *Logan* v. *United States*, 489
A.2d 485, 491–92 (D.C. 1985) (evidence was sufficient
to support inference of constructive possession because
jury reasonably could have found that defendant driver
"pulled the car over and slowed down to permit [the
front seat passenger] to open—and hold open—the pas-
senger door (of a two-door vehicle) from the front seat
while [the back seat passenger] . . . tossed out the
gun from the rear, lower portion of the door"). On this
evidentiary record, there are "so many reasons" for
the defendant's flight "that it scarcely comes up to the
standard of evidence tending to establish guilt . . . ."
(Internal quotation marks omitted.) *Alberty* v. *United
States*, 162 U.S. 499, 510, 16 S. Ct. 864, 40 L. Ed. 1051
(1896); see also *State* v. *Billie*, supra, 123 Conn. App.
700 (inference of dominion and control over contraband
must be based on more than "possibilities, surmise or
conjecture").

The defendant was not in constructive possession of
Spann's firearm at the moment prior to taking flight,
and she did not acquire constructive possession of the
firearm by driving away with Spann still in possession
of that firearm. Stated another way, her flight did not
change her possessory status vis-à-vis Spann's firearm.
The circumstances would be different if the defendant
had been involved in the shooting as a principal or
accessory, if Spann's firearm was stowed within her
reach during the police chase, if Spann had fled and
left the defendant with unobstructed access to the fire-
arm, or if the defendant's flight had caused some other
change in circumstances creating a direct nexus between
the defendant and the firearm itself. But the state estab-
lished none of these things, by reasonable inference or oth-
erwise.

For much the same reason, flight cannot serve to
demonstrate the defendant's consciousness of guilt on
these facts. "[C]onsciousness of guilt [is not] an element

State *v.* Rhodes

of the crime charged; the [g]overnment ha[s] to show
that [the defendant intentionally] possessed [the contra-
band], not that she was aware that she might be involved
in some sort of criminal activity." *United States* v.
*Morales*, 577 F.2d 769, 773 (2d Cir. 1978). Evidence of
this nature is generally understood to be of dubious
probative value, and for good reason.[10] See, e.g., *State*
v. *Jones*, 234 Conn. 324, 356, 662 A.2d 1199 (1995) (con-
sciousness of guilt evidence "is a species of evidence
that should be viewed with caution; it should not be

---

[10] See, e.g., *Wong Sun* v. *United States*, 371 U.S. 471, 483 n.10, 83 S. Ct.
407, 9 L. Ed. 2d 441 (1963) ("we have consistently doubted the probative
value in criminal trials of evidence that the accused fled the scene of an
actual or supposed crime"); *Alberty* v. *United States*, supra, 162 U.S. 511
("it is a matter of common knowledge that men who are entirely innocent do
sometimes fly from the scene of a crime through fear of being apprehended
as the guilty parties, or from an unwillingness to appear as witnesses"). In
support of its view that evidence of flight "is a species of evidence that
should be viewed with caution," the United States Court of Appeals for the
First Circuit explained: "Although it is undisputed that flight of an accused
can properly be admitted as having a tendency to prove guilt . . . it also
is acknowledged widely that, at least in many cases, such evidence is only
marginally probative as to the ultimate issue of guilt or innocence. . . .
[The inference of guilt] has been questioned by some courts, one of which
asserted that men who are entirely innocent do sometimes fly from the
scene of a crime for a multitude of reasons, including, for example, hesitation
to confront even false accusations, fear that they will be unable to prove
their innocence, or protection of a guilty party." (Citations omitted; internal
quotation marks omitted.) *United States* v. *Hernandez-Bermudez*, 857 F.2d
50, 54 (1st Cir. 1988); see also *United States* v. *Chipps*, 410 F.3d 438, 449
(8th Cir. 2005) ("courts should be cautious in admitting evidence of flight
because it is often only marginally probative of guilt"); *United States* v.
*Rodriguez*, 53 F.3d 1439, 1451 (7th Cir. 1995) ("[w]e have long adhered to
the [United States] Supreme Court's counsel that courts be wary of the
probative value of flight evidence" (internal quotation marks omitted)). Chief
Judge David L. Bazelon, quoting Sigmund Freud, provided a psychological
basis for questioning the assumption that a suspect's flight necessarily
reflects his actual guilt, as sometimes the suspect "is really not guilty of
the specific misdeed of which he is being accused, but he is guilty of a
similar [misdemeanor] of which [the authorities] know nothing and of which
[the authorities] do not accuse him. He therefore quite truly denies his guilt
in the one case, but in doing so betrays his sense of guilt with regard to
the other." (Internal quotation marks omitted.) *Miller* v. *United States*, 320
F.2d 767, 772 (D.C. Cir. 1963).

State *v.* Rhodes

admitted mechanically'' (internal quotation marks omitted)).

One reason that the probative value of flight evidence is regarded with caution is that the conclusion that flight indicates guilt requires four intermediate inferential steps. "The probative value of flight as evidence of a defendant's guilt depends on the degree of confidence with which four inferences can be drawn: (1) from behavior to flight; (2) from flight to consciousness of guilt; (3) from consciousness of guilt to consciousness of guilt concerning the crime charged; and (4) from consciousness of guilt concerning the crime charged to actual guilt of the crime charged." (Internal quotation marks omitted.) *State* v. *Scott*, 270 Conn. 92, 105, 851 A.2d 291 (2004), cert. denied, 544 U.S. 987, 125 S. Ct. 1861, 161 L. Ed. 2d 746 (2005). Numerous courts have observed that "[t]he use of evidence of flight has been criticized on the grounds that the second and fourth inferences are not supported by common experience and it is widely acknowledged that evidence of flight or related conduct is 'only marginally probative as to the ultimate issue of guilt or innocence.' " *United States* v. *Myers*, 550 F.2d 1036, 1049 (5th Cir. 1977), quoting *United States* v. *Robinson*, 475 F.2d 376, 384 (D.C. Cir. 1973). For this and related reasons, it is well established that consciousness of guilt alone is insufficient to support a criminal conviction. See *State* v. *Rosa*, 170 Conn. 417, 433, 365 A.2d 1135 ("[t]he flight of the person accused of [a] crime . . . *when considered together with all the facts of the case*, may justify an inference of the accused's guilt" (emphasis added; internal quotation marks omitted)), cert. denied, 429 U.S. 845, 97 S. Ct. 126, 50 L. Ed. 2d 116 (1976); see also *United States* v. *Pagán-Ferrer*, 736 F.3d 573, 594 (1st Cir. 2013) (trial court's instruction that "[n]o one can be convicted of a crime on the basis of consciousness of guilt alone" was proper (internal quotation marks omitted)), cert. denied sub nom. *Vidal-Maldonado* v. *United States*, 573

State *v.* Rhodes

U.S. 933, 134 S. Ct. 2839, 189 L. Ed. 2d 810 (2014); *United States* v. *Johnson*, 513 F.2d 819, 824 (2d Cir. 1975) (holding that evidence of consciousness of guilt is "insufficient proof on which to convict where other evidence of guilt is weak and the evidence before the court is as hospitable to an interpretation consistent with the defendant's innocence as it is to the [g]overnment's theory of guilt"); *People* v. *Kelly*, 1 Cal. 4th 495, 531, 822 P.2d 385, 3 Cal. Rptr. 2d 677 (under California law, jury may consider evidence of consciousness of guilt, "*but it is not sufficient by itself to prove guilt*" (emphasis in original)), cert. denied, 506 U.S. 881, 113 S. Ct. 232, 121 L. Ed. 2d 168 (1992); *Commonwealth* v. *Toney*, 385 Mass. 575, 585, 433 N.E.2d 425 (1982) (jury cannot "convict a defendant on the basis of evidence of flight or concealment alone"); *People* v. *Yazum*, 13 N.Y.2d 302, 304, 196 N.E.2d 263, 246 N.Y.S.2d 626 (1963) (distinguishing between admissibility and sufficiency of consciousness of guilt evidence).

In the present case, the defendant's flight is not probative of her consciousness of guilt with respect to the theory that she was in possession of Spann's firearm for the same reasons it is not probative of her intent to possess Spann's firearm. Whether she fled out of undifferentiated fear, because she understood immediately that any claim of innocence, however truthful, would not be accepted by law enforcement under the circumstances, because she wanted to protect her friend Spann, or even because she believed herself to be actually guilty of some criminal act relating to the shooting (such as attempted assault or interfering with a police officer, for which she ultimately was acquitted by the jury), it is not reasonable to conclude on this record that she probably fled because she believed herself to be guilty of possessing Spann's firearm. "[T]he interpretation to be gleaned from an act of flight should be made with a sensitivity to the facts of the particular

State *v.* Rhodes

case'' because flight might be indicative of an intent to flee ''an entirely different crime . . . .'' *United States* v. *Ramon-Perez*, 703 F.2d 1231, 1233 (11th Cir.), cert. denied, 464 U.S. 841, 104 S. Ct. 136, 78 L. Ed. 2d 130 (1983). When a criminal defendant has been charged with multiple crimes, evidence of consciousness of guilt as to *one* crime does not equate to evidence of consciousness of guilt of *a different* crime. See, e.g., *United States* v. *Atchley*, 474 F.3d 840, 853 (6th Cir.) (observing that defendant's ''alleged flight could have been due to the murder charge and not the charges here''), cert. denied, 550 U.S. 965, 127 S. Ct. 2447, 167 L. Ed. 2d 1145 (2007); *United States* v. *Hernandez-Bermudez*, 857 F.2d 50, 53 (1st Cir. 1988) (''[T]here is a difference between a consciousness of guilt about possessing cocaine and guilt about intending to distribute the drug. [The] [d]efendant's testimony acknowledged the former, but not the latter. But we doubt that [the defendant's] flight could any more show consciousness of guilt over the *distribution* of cocaine than over its conceded possession.'' (Emphasis in original.)). I doubt it, but the defendant's flight might have been indicative of her consciousness of actual guilt as to certain criminal offenses that are not at issue in this appeal, such as using a motor vehicle without the owner's permission. See General Statutes § 53a-119b (a). It is not indicative of her consciousness of guilt of the specific crime under consideration—criminal possession of Spann's firearm in violation of § 53a-217 (a).

The majority, quoting *State* v. *Otto*, 305 Conn. 51, 74, 43 A.3d 629 (2012), relies on the uncontroverted but also unhelpful premise that the jury was '' 'not required to draw only those inferences consistent with innocence' '' to conclude that ''the possibility of other, innocent 'inferences from these facts is not sufficient to undermine [the jury's] verdict . . . .' '' Of course that is true. It does not follow, however, that the *plausibility*

State *v.* Rhodes

of the inculpatory inferences is immaterial to our sufficiency review. As we explained in *State* v. *Reynolds*, supra, 264 Conn. 1, "[a]n inference is not legally supportable . . . merely because the scenario that it contemplates is remotely possible under the facts. To permit such a standard would be to sanction fact-finding predicated on mere conjecture or guesswork. Proof by inference is sufficient, rather, only if the evidence produces in the mind of the trier a *reasonable belief in the probability of the existence* of the material fact." (Emphasis in original; internal quotation marks omitted.) Id., 97. Under the factual circumstances of the present case, an inference that the defendant fled the scene of the shooting in order to exercise dominion or control over Spann's firearm is possible but by no means reasonably probable. See id., 97–98 (holding that evidence was insufficient to establish aggravating factor under General Statutes (Rev. to 1991) § 53a-46a (h) (4), even though "it probably would not have been *impossible* for the defendant to have formulated the intent to torture [the victim] in the extremely brief period of time between the firing of the first shot and the firing of additional gunshots" because "the likelihood that the defendant had changed his intent . . . is too remote to be reasonable" (emphasis in original)).

In summary, the evidence of flight adds no force to the otherwise insufficient evidence of constructive possession. Pointing to the defendant's consciousness of guilt or her subjective belief that she may be guilty of a crime cannot provide the state with the evidence of constructive possession that it otherwise lacks.

The third circumstance that the majority relies on, the defendant's relationship with Spann, fares no better and supplies no additional weight to support the defendant's conviction. It is a fundamental precept that mere friendship or association with a known criminal "does not establish a logical connection with the [criminal's]

State *v.* Rhodes

crime.'' *State* v. *Kelsey*, 160 Conn. 551, 553, 274 A.2d 151 (1970). Indeed, we previously have observed that it ''would clearly be improper'' for the jury to infer guilt on the basis of ''mere association . . . .'' Id., 554; see also *United States* v. *Di Re*, 332 U.S. 581, 593, 68 S. Ct. 222, 92 L. Ed. 210 (1948) (reversing defendant's conspiracy conviction, even though he was present in car in which counterfeit ration coupons were found, because ''[p]resumptions of guilt are not lightly to be indulged from mere meetings''); *United States* v. *Nusraty*, 867 F.2d 759, 764 (2d Cir. 1989) (reversing defendant's conviction of conspiracy to possess heroin with intent to distribute because ''mere association with those implicated in an unlawful undertaking is not enough to prove knowing involvement'').

The claim is especially weak in the present case because the jury affirmatively rejected the state's theory that the defendant intended to facilitate the shooting by acting as Spann's getaway driver. The state pursued its getaway driver theory with respect to the charge of attempt to commit assault in the first degree, but the jury was not persuaded and found the defendant not guilty of aiding Spann in the shooting. Because the trial was bifurcated, the jury considered the charge of criminal possession of a firearm after the defendant had been found not guilty of aiding Spann's attempted assault and interfering with an officer but guilty of having a weapon in a motor vehicle, using a motor vehicle without the owner's permission, and reckless driving. With respect to the criminal possession charge, the jury was not instructed on accessorial liability, and the state did not argue that the defendant constructively possessed Spann's firearm by acting as his getaway driver. Instead, the state argued that the defendant constructively possessed Spann's firearm because ''she was aware of . . . the presence of the gun'' and she easily could ''get it'' within the close confines of the motor

State *v.* Rhodes

vehicle. Thus, although the majority declines to accept this simple fact, the state in its closing argument entirely abandoned its joint criminal venture theory, premised on the defendant being Spann's getaway driver, in favor of a theory that the defendant was in constructive possession of Spann's firearm because she could "exercise dominion and control [over it] within [the] relatively small space of the interior of the [vehicle]."

The majority thus advances a "getaway driver" theory in support of the possessory crime that the state itself did not make in its argument to the jury on that charge. The risk of becoming a seventh juror, it seems, is open to all comers. Our duty to construe the evidence in the light most favorable to sustaining the verdict should not, in my view, be taken as an invitation to substitute new legal theories for the arguments used by the state to obtain the conviction at trial. Cf. *State* v. *Carter*, 317 Conn. 845, 853–54, 120 A.3d 1229 (2015) ("When the state advances a specific theory of the case at trial . . . sufficiency of the evidence principles 'cannot be applied in a vacuum. Rather, they must be considered in conjunction with an equally important doctrine, namely, that the state cannot change the theory of the case on appeal.' "). Moreover, the state did not advance a getaway driver theory on the possession charge for good reason, namely, because the jury already had rejected that theory when it acquitted the defendant of attempted assault by acting as Spann's accomplice in the shooting. The majority's efforts to resurrect the state's abandoned and rejected theory are unavailing.[11]

[11] The majority points out that the verdict finding the defendant guilty on the possession charge is not necessarily inconsistent with the verdict finding the defendant not guilty of attempted assault as an accessory. See footnote 18 of the majority opinion. The majority posits that the jury may have concluded that the defendant shared Spann's intention with regard to shooting the firearm but not his intention to cause serious physical injury. This "asymmetrical intentions" scenario is not impossible as a matter of abstract logic, but it is unlikely, to say the least, that a lay jury entertained (much less adopted) the needle threading theory posited by the majority—particularly

State *v.* Rhodes

This brings me to the fourth and weakest circumstance relied on by the majority—the fact that "the defendant sat within arm's reach of the gun throughout the afternoon." What this theory ignores is that there was, at all times, an animate physical mass separating the defendant's arm from the firearm, and his name was Lamar Spann. There is no evidence of any kind that Spann's firearm was even momentarily stowed in the center console, the glove compartment, or any other communal space within the vehicle to which the defendant had access. Instead, the evidence before the jury established that Spann had the firearm either on or under his person at all relevant times.[12] Because the firearm was in Spann's exclusive physical possession, the defendant's proximity to Spann in the relatively small confines of the interior of the car is insufficient to support a reasonable inference that she had the ability and intent to exercise

when the state itself never promoted that theory. Logical possibility is not the same as reasonable probability, and it remains highly improbable on this record that the jury decided to convict the defendant of criminal possession of a firearm on the basis of a theory *that was never even advanced by the state with respect to that charge.*

The question, moreover, is not one of theoretical consistency but of evidentiary sufficiency. Even if we were to assume that the jury logically could have adopted a theory of accessorial guilt not argued by the state in support of the charge at issue, by crediting the state's getaway driver theory on the criminal possession charge after rejecting that theory with respect to the attempted assault charge, I disagree with the majority that the jury reasonably could have done so on this evidentiary record. As I previously explained, there was no evidence that the defendant had any knowledge that Spann even was carrying a firearm prior to the shooting; nor was there any evidence of a prior joint criminal activity or any prior planning. I am left to conclude under these circumstances that the evidence necessarily was insufficient to support a reasonable inference that "[the defendant] and Spann brought the gun to Trumbull Avenue for the purpose of firing it and that the defendant would serve as the getaway driver." Footnote 18 of the majority opinion. It seems likely that the state did not argue this inference because the evidence did not support it.

[12] Prior to the shooting, Spann testified that he kept the firearm concealed "under [his] lap . . . ." After the shooting, Spann either held or briefly lodged the firearm "on the side of the door . . . in between the seat and the door."

State *v.* Rhodes

dominion and control over his firearm, that is, to "go and get it." As the District of Columbia Court of Appeals explained: "[T]here is no 'automobile' exception to the settled general rule that knowledge and proximity alone are insufficient to prove constructive possession of [contraband] beyond a reasonable doubt. . . . As in all other constructive possession cases, there must be something more in the totality of the circumstances—a word or deed, a relationship or other probative factor— that, considered in conjunction with the evidence of proximity and knowledge, proves beyond a reasonable doubt that the [defendant] *intended* to exercise dominion or control over the [contraband], and was not a mere bystander." (Emphasis in original.) *Rivas* v. *United States*, 783 A.2d 125, 128 (D.C. 2001). Although "[i]t may be foolish to stand by when others are acting illegally, or to associate with those who have committed a crime . . . [s]uch conduct or association . . . *without more*, does not establish" constructive possession. (Emphasis in original; internal quotation marks omitted.) Id., 130; see *State* v. *Nova*, 161 Conn. App. 708, 724, 129 A.3d 146 (2015) (reversing defendant's possession of narcotics conviction because defendant's "mere proximity" to contraband and interaction with individual who had snorted some unknown substance was insufficient to establish dominion or control over contraband, and "[t]o conclude otherwise required the [trial] court to engage in impermissible speculation"); *State* v. *Fermaint*, 91 Conn. App. 650, 657–63, 881 A.2d 539 (evidence was insufficient to establish that defendant violated his probation by possessing narcotics because driver of vehicle was in actual physical possession of narcotics, and evidence that defendant, who was passenger in vehicle, engaged in "nondescript furtive movement" before traffic stop and was in proximity to crumbs of crack cocaine found on seat did not establish individual connection between defendant and narcotics), cert. denied, 276 Conn. 922, 888 A.2d 90 (2005).

State *v.* Rhodes

The majority points out that "[t]he jury did not have to credit'' Spann's testimony that the firearm was in his exclusive physical possession before, during, and after the shooting, and that it was "entitled to credit Spann's testimony that the gun was located in the area of the front seat while discrediting his claims that he physically held the gun in a way that prevented the defendant from accessing it . . . .'' The argument is that Spann was a drug dealer, a convicted felon, a liar, and the defendant's loyal friend, and, therefore, "[t]he jury had good reason to question [his] credibility . . . .'' According to the majority's hypothesis, Spann's "tale seeking to exonerate the defendant'' not only "strained credibility''; it was "risible,'' "sidesplitting,'' and would cause "the jurors' eyes [to roll] . . . .'' I agree with the majority that the jury was free to discredit all, a portion, or none of Spann's testimony. I decline, however, to engage in a fictional account of the jury's conduct at trial, and I strenuously disagree with the majority's suggestion that Spann's testimony can be dissected in a manner that inculpates the defendant in his possessory crime. The argument itself would be risible if the occasion was less solemn. The jury, of course, was free to disbelieve Spann's testimony that he "assiduously kept the gun where [the defendant] could not get it,'' but it was not free to infer the opposite, namely, that Spann placed the gun in a location to which the defendant had physical access. See, e.g., *Woodall* v. *State*, 97 Nev. 235, 236–37, 627 P.2d 402 (1981) (holding that evidence was insufficient to support defendant's conviction of possession of firearm when defendant's companion "acknowledged that the weapon was his and that [the defendant] knew nothing about its existence,'' reasoning that "a rational trier of fact could not reject a plausible explanation consistent with [the defendant's] innocence, and thereupon infer [the defendant] to be guilty based on evidence from which only uncertain inferences may be drawn''). "[I]t is axiomatic under Connect-

294 OCTOBER, 2020 335 Conn. 226

State *v.* Rhodes

icut law that, while a [trier of fact] may reject a defendant's testimony, a [trier of fact] in rejecting such testimony cannot conclude that the opposite is true. . . . Thus, under Connecticut law, the [trier of fact] is not permitted to infer, from its disbelief of the defendant's testimony that any of the facts which he denied were true.''[13] (Internal quotation marks omitted.) *State* v. *McCarthy*, 105 Conn. App. 596, 619, 939 A.2d 1195, cert. denied, 286 Conn. 913, 944 A.2d 983 (2008). This rule "has been applied uniformly in both criminal and civil contexts''; (internal quotation marks omitted) id., 620; regardless of whether the witness' testimony was proffered by the plaintiff or the defendant. See, e.g., *State* v. *Hart*, 221 Conn. 595, 605–606, 605 A.2d 1366 (1992) (although jury was free to disbelieve testimony of defense witnesses that defendant was not drug-dependent, it was not free to infer opposite); see also

---

[13] The prohibition against the antithesis inference is not unique to Connecticut; it is "hornbook law" recognized in state and federal courts throughout the country. *Walker* v. *New York*, 638 Fed. Appx. 29, 31 (2d Cir. 2016); see, e.g., id. ("it is hornbook law that a plaintiff does not carry his burden of proving a fact merely by having witnesses deny that fact and asking the jury to decline to believe the denials"); *Grimm* v. *State*, 135 A.3d 844, 859 (Md. 2016) ("[m]any jurisdictions, including Maryland, recognize the doctrine that disbelief of testimony may not alone support a finding in civil and criminal litigation" (internal quotation marks omitted)); *Chapman* v. *Troy Laundry Co.*, 47 P.2d 1054, 1062 (Utah 1935) ("[w]hile the demeanor of the witness in testifying is very important and should be given consideration by the trier of fact, still there must be something more than the batting of an eye, the coloring of the cheek, or the twiddling of the thumbs as a basis for finding facts"); A. Pollis, "The Death of Inference," 55 B.C. L. Rev. 435, 461–62 (2014) ("[C]ourts, including the [United States] Supreme Court, have generally been hostile to accepting the probative value of the antithesis inference, especially without other evidence in support of the party carrying the burden of proof. For example, in 1891, the [c]ourt in *Bunt* v. *Sierra Butte Gold Mining Co.* [138 U.S. 483, 485, 11 S. Ct. 464, 34 L. Ed. 1031 (1891)] held that a plaintiff could not meet his burden of proof by calling the defendant's employees as witnesses in the hope that the jury would disbelieve them. Over the years, numerous cases have similarly rejected the antithesis inference as an adequate basis for submitting a case to the jury. The First Circuit explained that the danger of permitting the antithesis inference was 'obvious,' as it would allow a plaintiff to prove its case solely through impeachment." (Footnotes omitted.)).

State *v.* Rhodes

*State* v. *Alfonso*, 195 Conn. 624, 634–35, 490 A.2d 75
(1985) ("[e]ven if the jury did not credit the defendant's
denial, it was not entitled to conclude that the marijuana
was his without positive evidence supporting such a con-
clusion," and "the state offered no supporting evidence
that would have justified an inference that the defen-
dant possessed the marijuana"); *Novak* v. *Anderson*,
178 Conn. 506, 508, 423 A.2d 147 (1979) ("While it is
true that it is within the province of the jury to accept
or reject a defendant's testimony, a jury in rejecting
such testimony cannot conclude that the opposite is
true. . . . A jury cannot, from a disbelief of a defen-
dant's testimony, infer that a plaintiff's allegation is
correct." (Citations omitted.)). "Our rule barring the
inference of the opposite of testimony" is evidentiary
in nature and ensures "the proper method of measuring
the sufficiency of the evidence." *State* v. *Hart*, supra,
605–606. Thus, even if the jury disregarded Spann's
testimony,[14] given that the state failed to adduce any
"[positive] evidence that would have justified an infer-
ence that the defendant possessed" Spann's firearm;
*State* v. *Alfonso*, supra, 634–35; the evidence was insuffi-
cient to support the defendant's criminal possession of
a firearm conviction.[15]

---

[14] The majority states that my analysis "relies on and credits the entirety
of Spann's testimony" and "accept[s] Spann's testimony at face value . . . ."
Footnote 22 of the majority opinion. I do not understand what prompts this
statement, and it is not true. To repeat, the jury was entitled to accept all,
some, or *none* of Spann's testimony. Regardless of whether, and to what
extent, the jury credited Spann's testimony, there simply is no evidence in
the record that the firearm at any time was located anywhere except for
where the police saw it—in Spann's physical possession. Without relying
on pure speculation, in other words, no reasonable juror could find that
Spann probably left his firearm, however briefly, in an area of the vehicle
where the defendant could "go and get it" during the high-speed police
chase. Guesswork is not the same as reasonable inference.

[15] The majority's reliance on *Maryland* v. *Pringle*, 540 U.S. 366, 124 S. Ct.
795, 157 L. Ed. 2d 769 (2003), in support of its definition and application of
the constructive possession doctrine is misplaced. In *Pringle*, drugs were
found in the common area of a motor vehicle, and the United States Supreme
Court observed that the "quantity of drugs and cash in the car indicated

State *v.* Rhodes

In my view, the majority piles speculative inference on top of speculative inference to uphold the defendant's criminal possession of a firearm conviction. For the reasons previously explained, a driver's knowledge that his or her front seat passenger is in actual physical possession of contraband is insufficient to support a reasonable inference that the driver had dominion or control over that contraband; flight from the police does not vest a driver with constructive possession of contraband that he or she did not possess before taking flight; a defendant's knowing association with a person in actual physical possession of contraband is insufficient to establish that the defendant had the power and intent to control that contraband; disbelief of a witness' testimony cannot supply the state with the positive evidence of guilt that it otherwise lacks; and the accumulated weight of these flawed inferences will not support a criminal conviction that cannot rest independently on any one of them. Accordingly, I dissent from part I of the majority opinion.

II

I agree with the majority that the evidence was sufficient to convict the defendant of the crime of having a weapon in a motor vehicle in violation of § 29-38 (a). In light of what already has been said, however, it should be clear that I do not agree with the majority that the

the likelihood of [all occupants being involved in] drug dealing . . . .'' Id., 373. Importantly, there was no evidence "singling out" any one of the occupants of the vehicle as the owner of the drugs, and the court cautioned that " '[a]ny inference that everyone on the scene of a crime is a party to it must disappear if the [g]overnment . . . singles out the guilty person.' " Id., 374, quoting *United States* v. *Di Re*, supra, 332 U.S. 594. In the present case, Spann not only confessed to his exclusive ownership and possession of the firearm, he also pleaded guilty to carrying the firearm without a permit and criminal possession of the firearm. Given that the state "single[d] out" and convicted "the guilty person," any inference that the defendant was involved in Spann's criminal possession of the firearm "must disappear" in the present case. (Internal quotation marks omitted.) Id.

State *v.* Rhodes

defendant's conviction can be sustained on the basis of a finding that she constructively possessed Spann's firearm. I nonetheless would uphold the defendant's conviction because possession is not an essential element of the crime. What is required instead is proof that the defendant "(1) owned, operated or occupied the vehicle; (2) had a weapon in the vehicle; (3) knew the weapon was in the vehicle; and (4) had no permit or registration for the weapon." *State* v. *Davis*, 324 Conn. 782, 801, 155 A.3d 221 (2017); see also *State* v. *Owens*, 25 Conn. App. 181, 186, 594 A.2d 991 ("[t]here are four elements that the state must prove in a prosecution for a violation of . . . § 29-38: (1) that the defendant owned, operated or accepted the vehicle; (2) that he had a weapon in the vehicle; (3) that he knew the weapon was in the vehicle; and (4) that he had no permit or registration for the weapon"), cert. denied, 220 Conn. 910, 597 A.2d 337 (1991). The state is not required to prove possession— actual or constructive—to obtain a conviction under § 29-38 (a). See *State* v. *Owens*, supra, 187–88 ("[t]he clear intent of § 29-38 is to make it a crime to have a weapon in a motor vehicle, and '[t]he statute is not concerned with possession or ownership of a weapon, but rather aims to penalize those who know that there is a weapon inside a motor vehicle' "), quoting *State* v. *Mebane*, 17 Conn. App. 243, 246, 551 A.2d 1268, cert. denied, 210 Conn. 811, 556 A.2d 609, cert. denied, 492 U.S. 919, 109 S. Ct. 3245, 106 L. Ed. 2d 591 (1989).

The defendant concedes that, under our current case law, the evidence is sufficient to sustain her conviction because the jury reasonably could have found that she operated a motor vehicle, there was a weapon inside the vehicle, she knew there was a weapon inside the vehicle, and the weapon had no permit or registration. The defendant asks this court to reconsider and overrule our case law defining the essential elements of the crime of having a weapon in a motor vehicle, arguing

State *v.* Rhodes

that ''[t]his court has misinterpreted the legislative intent of [the] statute'' because the legislature intended the term ''knowingly has'' in § 29-38 (a) to be construed as ''knowingly possesses.''

The defendant failed to preserve her statutory construction claim in the trial court, and it is well established that this court generally will not review claims raised for the first time on appeal unless the requirements for review under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015),[16] have been satisfied or reversal is warranted under the plain error doctrine or our supervisory authority. The defendant's statutory construction claim fails under the second prong of *Golding* because it is not a claim of constitutional magnitude alleging the violation of a fundamental right. See *State* v. *Golding*, supra, 240 (observing that nonconstitutional claims ''do not warrant special consideration simply because they bear a constitutional label''); see also *State* v. *Rodriguez-Roman*, 297 Conn. 66, 93, 3 A.3d 783 (2010) (declining to review insufficiency of evidence and instructional impropriety claims because ''the defendant has clothed what can only be described as a nonconstitutional claim in constitutional garb''). The defendant also cannot prevail under the plain error doctrine because ''[i]t is axiomatic that the trial court's proper application of the law existing at the time of trial cannot constitute reversible error

---

[16] Under *State* v. *Golding*, supra, 213 Conn. 233, ''a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail.'' (Emphasis in original; footnote omitted.) Id., 239–40; see *In re Yasiel R.*, supra, 317 Conn. 781 (modifying third prong of *Golding*).

State *v.* Rhodes

under the plain error doctrine.'' *State* v. *Diaz*, 302 Conn. 93, 104 n.8, 25 A.3d 594 (2011). Lastly, this is not one of those rare cases that merits the invocation of the ''extraordinary remedy'' of reversal under our supervisory authority. (Internal quotation marks omitted.) *State* v. *Reyes*, 325 Conn. 815, 822–23, 160 A.3d 323 (2017); see id. (''[T]he supervisory authority of this state's appellate courts is not intended to serve as a bypass to the bypass, permitting the review of unpreserved claims of case specific error—constitutional or not—that are not otherwise amenable to relief under *Golding* or the plain error doctrine. . . . Consistent with this general principle, we will reverse a conviction under our supervisory powers only in the rare case that fairness and justice demand it. [T]he exercise of our supervisory powers is an extraordinary remedy to be invoked only when circumstances are such that the issue at hand, while not rising to the level of a constitutional violation, is nonetheless of [the] utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole.'' (Citations omitted; internal quotation marks omitted.)). There being no basis for reversal, I would uphold the defendant's conviction of having a weapon in a motor vehicle.

For the foregoing reasons, I dissent from part I of the majority opinion upholding the defendant's conviction of criminal possession of a firearm in violation of § 53a-217 (a) and concur in part II of the majority opinion upholding the defendant's conviction of having a weapon in a motor vehicle in violation of § 29-38 (a).